ACCEPTED
03-15-000428-cv
7271364
THIRD COURT OF APPEALS
AUSTIN, TEXAS
10/7/2015 2:08:43 PM
JEFFREY D. KYLE
CLERK

## NO. 03-15-00428-CV

---

### IN THE COURT OF APPEALS
### FOR THE THIRD DISTRICT OF TEXAS
### AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
10/7/2015 2:08:43 PM
JEFFREY D. KYLE
Clerk

---

### BERNARD MORELLO,
*Appellant*,

**v.**

### THE STATE OF TEXAS,
*Appellee*.

---

On Appeal from Cause No. D-1-GV-06-000627
353RD Judicial District Court, Austin, Texas
The Honorable Rhonda Hurley

---

### APPELLANT'S BRIEF

---

**Juranek Law Firm, PLLC**
James Juranek
SBN 24026888
111 N. Ennis
Houston, Texas  77003
Telephone:  (713.229.0699
Facsimile:   (888) 626.6596
james@jjfirm.com

**LAPEZE & JOHNS, PLLC**
Keith W. Lapeze
Texas Bar No. 24010176
601 Sawyer Street, Suite 650
Houston, Texas 77007
Tel. (713) 739-1010
Fax. (713) 739-1015
keith@lapezejohns.com

ORAL ARGUMENT REQUESTED

i

## IDENTITIES OF PARTIES AND COUNSEL

**Defendant/Appellant:**
Bernard Morello

**Plaintiff/Appellee:**
The State of Texas

**Trial/Appellate Counsel for Defendants/Appellants:**

**LAPEZE & JOHNS, PLLC (trial/appeal)**
Keith W. Lapeze
Texas Bar No. 24010176
Taylor L. Shipman
Texas Bar No. 24079323
601 Sawyer Street, Suite 650
Houston, Texas 77007
Tel. (713) 739-1010
Fax. (713) 739-1015
keith@lapezejohns.com
taylor@lapezejohns.com

**Juranek Law Firm, PLLC (appeal only)**
James Juranek
Texas Bar No. 24026888
111 N. Ennis
Houston, Texas  77003
Telephone:  (713.229.0699
Facsimile:   (888) 626.6596
james@jjfirm.com

**Trial/Appellate Counsel for Plaintiff/Appellee:**

**Greg Abbott** (Attorney General of Texas)
**Barry R. McBee** (First Assistant Attorney General)
**Edward D. Burbach** (Deputy Attorney General for Litigation)
**Karen Kornwell** (Assistant Attorney General)
**David Priester**
Texas Bar No. 16245800
**Ryan P. Fite**
Texas Bar No. 24045873
**Craig J. Pritzlaff**
Texas Bar No. 24046658

Environmental Protection Division
P.O. Box 12548, MC-066
Austin, TX 78711-2548
Telephone: (512) 475-4138
Facsimile: (512) 320-0911

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ....................................................................ii

TABLE OF CONTENTS ............................................................................................ iv

TABLE OF AUTHORITIES.....................................................................................viii

STATEMENT OF THE CASE ...................................................................................xii

STATEMENT REGARDING ORAL ARGUMENT .......................................................xiii

ISSUES PRESENTED ...............................................................................................xiii

ISSUE ONE...............................................................................................................xiii

Whether the trial court's grant of summary judgment against Morello was error requiring reversal of such judgment and remand of the case for a new trial?

ISSUE TWO ...............................................................................................................xiii

Whether the trial court abused its discretion and committed harmful, reversible error by denying Morello's Motion for New Trial based on the erroneous severance of the State's claims against White Lion Holdings, LLC from its identical claims against Morello?

ISSUE THREE ............................................................................................................xiii

Whether the trial court abused its discretion and committed harmful, reversible error by denying Morello's Motion for New Trial based on newly discovered evidence?

STATEMENT OF FACTS ............................................................................................ 1

I.      BACKGROUND .............................................................................................. 1

        A.     The History of the Property Involved in this Case ...................................... 1

        B.     Morello Subsequently Obtains the Purchase Rights for the Property
               and Transfers Same to White Lion; White Lion Purchases the
               Property in April 2004.................................................................................. 1

C.     White Lion Takes Transfer of the Compliance Plan and its Obligations from Vision................................................................. 2

D.     After White Lion's Purchase of the Property, Much of the Infrastructure Related to CP-50129 Was Removed or Destroyed by Third Parties ............................................................................... 2

E.     Given the Scope and Cost of Repairs, White Lion Was Unable to Comply With the Remedial Elements of CP-50129 or Post Proof of Financial Assurance ................................................................... 3

F.     The State Files Suit Against White Lion and Subsequently Adds Morello in His Individual Capacity ........................................... 4

G.     Morello Files His Motion for  New Trial Which the Trial Court Denies................................................................................... 5

SUMMARY OF THE ARGUMENT.......................................................... 6

ARGUMENT ........................................................................................... 8

ISSUE ONE............................................................................................. 8

I.     THE TRIAL COURT'S SUMMARY JUDGMENT WAS ERROR ...................... 8

A.     Summary Judgment Standard of Review ...................................... 8

B.     The Trial Court's Grant of Summary Judgment Was Error Because the State Failed to Prove Its Cause of Action as a Matter of Law ............... 8

     1.     Under this Court's Decision in *Shook v. Walden*, Morello's Liability Could only Be Established through  Veil Piercing/Fraud as Opposed to the State's Theory of Direct Liability .................................................................... 10

     2.     Assuming *Shook's* Holding Requiring Veil Piercing/Fraud Doesn't Control in this Case, Establishing Liability Under the *Miller v. Keyser* Line of Authority As the State Argued Requires Proof of ***Tortious Conduct*** by the Corporate Agent........ 13

          a.     *Karl and Kelly Company v. McLerran*: Corporate Officers/Agents Only Liable Under Alter Ego Theory ........ 14

b. *Light v. Wilson*: Impliedly Overruling *McLerran* by Holding that Corporate Agents May Also Be Liable for Their Own Tortious Misconduct ...................................... 15

c. *Leyendecker & Associates v. Wechter*: Affirming *Light* and Upholding Corporate Agent Liability for Agent's <u>Tortious Acts</u> .............................................. 16

d. *Wetzel v. Barnes*: Reaffirming that Courts May Impose Personal Liability on Corporate Agents Where Agent Engages in <u>Affirmative Tortious Conduct</u> ................. 17

e. *Miller v. Keyser*: Reaffirming *Light* and *Weitzel* and Holding that a Corporate Agent Is Personally Liable Only for His Own <u>Fraudulent or Tortious Acts</u> ................. 18

f. Because the State Never Pleaded, Proved, or Argued Tortious Conduct by Morello, the Court's Grant of Summary Judgment Imposing Personal Liability Against Morello Was Error ..................................... 19

3. The *State v. Malone* Decision Is Inapposite as It Affirmed Individual Liability Against Corporate Officers Based Upon Their Commission of "Environmental Torts" ................................. 21

4. The *Health Enrichment* Decision Is Inapposite as It Affirmed Individual Liability Against a Corporate Officer Based Upon a Statutory Exception ..................................... 26

ISSUE TWO ........................................................................ 28

II. THE TRIAL COURT'S DENIAL OF MORELLO'S MOTION FOR NEW TRIAL FOR IMPROPER SEVERANCE OF PARTIES WAS ERROR ............. 28

A. Standard of Review ................................................. 28

B. The Severance Proceedings in the Trial Court............................ 29

C. A Trial Court Abuses Its Discretion By Severing Actions which Are Interwoven with the Remaining Claims Involving the Same Facts and Issues .................................................. 30

D. The State's Claims Against White Lion and Morello Involved the Identical Facts and Issues Making Severance Error .................................. 31

vi

  E. Additionally, the Trial Court's Severance Order Was Also an Abuse of Discretion as It Was Entered Post-Submission ....................................... 32

  F. The Trial Court's Severance Error Was Harmful as It Resulted in an Impermissible Double Recovery for the State as Well as an Excessive Fine in Violation of the Texas and United States Constitutions ........................................................................................ 33

  G. The Trial Court's Severance Error Was Harmful as It Violates The Equal Protection, And Due Course Of Law Provisions Of The Texas Constitution, And The Due Process And Equal Protection Provisions Of The U.S. Constitution ........................................................................... 35

ISSUE THREE .......................................................................................................... 36

III. THE COURT'S DENIAL OF MORELLO'S MOTION FOR NEW TRIAL BASED ON NEWLY-DISCOVERED EVIDENCE WAS ERROR ................... 36

  A. The Grant of a New Trial Based on Newly-Discovered Evidence Is Subject to the Discretion of the Trial Court ................................................ 36

  B. Morello's Newly-Discovered Evidence Established that CP-50129 and Its Remediation Obligations Were Based on Appellee's Erroneous Determination of the Affected Aquifer ..................................... 36

  C. Morello's Failure to Discover the New Evidence Was Not Due to Lack of Diligence on His Part .................................................................... 39

  D. Morello Established that the Newly-Discovered Evidence Was Not Cumulative ............................................................................................... 40

  E. Morello's Newly-Discovered Evidence Would Have Eliminated the Need for the Trial Below ......................................................................... 41

PRAYER ................................................................................................................... 42

CERTIFICATE OF COMPLIANCE ........................................................................ 43

CERTIFICATE OF SERVICE ................................................................................. 44

APPENDIX ............................................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*Allseas USA, Inc. v. PS Fabricators, L.L.C.*,
2012 WL 7849219 (Tex. App.—Corpus Christi 2012, no pet.) ............................ 39

*Benz Group v. Barreto*,
404 S.W.3d 92 (Tex. App.–Houston [1st Dist.] 2013, no pet.) ............................ 39

*Brownlee v. Brownlee,*
665 S.W.2d 111 (Tex. 1984) ................................................................................. 8

*Dalisa, Inc. v. Bradford,*
81 S.W.3d 876 (Tex. App.—Austin 2002, no pet.) .............................................. 33

*Edwards v. Edwards,*
418 S.W.3d 757 (Tex. App.—El Paso 2013, no pet.) ........................................... 39

*Goode v. Shoukfeh,*
943 S.W.2d 441 (Tex. 1997) ................................................................................ 28

*Guar. Fed. Sav. Bank v. Horseshoe Operating Co.,*
793 S.W.2d 652 (Tex. 1990) ........................................................................... 30-31

*Health Enrichment and Longevity Institute, Inc. v. Tex.,*
No. 03-03-00578-CV, 2004 WL 1572935 (Tex. App.–Austin 2004, no writ) (not
reported for publication) .................................................................................. 26-27

*Indus. Clearinghouse, Inc. v. Jackson Walker, L.L.P.*,
162 S.W.3d 384 Tex. App.—Dallas 2005, pet denied.) ...................................... 38

*In re Paso Del Norte Surgery Ctr.,*
281 S.W.3d 521 (Tex. App.—El Paso 2008, orig. proceeding) ............................ 28

*Jackson v. Van Winkle,*
660 S.W.2d 807 (Tex. 1983) ................................................................................ 36

*Jones v. Ray*,
886 S.W.2d 817 (Tex. App.—Houston [1st Dist.] 1994, orig. proceeding) .......... 31

*Karl and Kelly Co. Inc. v. McLerran,*
646 S.W.2d 174 (Tex. 1983) (per curiam) .......................................................... 14

*Leyendecker v. Wechter,*
 683 S.W.2d 369 (Tex. 1984) ........................................................................ 16, 24

*Light v. Wilson,*
 663 S.W.2d 813 (Tex. 1984) .............................................................................. 15

*Marin Real Estate Partners, L.P. v. Vogt,*
 373 S.W.3d 57 (Tex. App.—San Antonio 2011, pet. filed) ................................ 33

*Maxey v. Citizens Nat'l Bank of Lubbock,*
 507 S.W.2d 722 (Tex. 1974) .............................................................................. 24

*Miller v. Keyser,*
 90 S.W.3d 712 (Tex. 2002) .......................................................................... 18-19

*MMP, Ltd. v. Jones,*
 710 S.W.2d 59 (Tex. 1986) .................................................................................. 8

*Nixon v. Mr. Property Mgmt. Co.,*
 690 S.W.2d 546 (Tex. 1985) ................................................................................ 8

*Parkway Co. v. Woodruff,*
 901 S.W.2d 434 (Tex. 1995) .............................................................................. 33

*Pennington v. Singleton,*
 606 S.W.2d 682 (Tex. 1980) .............................................................................. 34

*Physio GP, Inc. v. Naifeh,*
 306 S.W.3d 886 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ...................... 21

*R. Comm. Inc. v. Sharp,*
 875 S.W.2d 314 (Tex. 1994) .............................................................................. 35

*Santos v. Holzman,*
 No. 13-02-662-CV, 2005 WL 167309, at *4 (Tex. App.—Corpus Christi
 Jan. 27, 2005, pet. denied) (mem. op.) .............................................................. 31

*Shook v. Walden,*
 368 S.W.3d 604 (Tex. App.—Austin 2012, pet. denied) ................................ 10-12

*Sims v. Brackett,*
 885 S.W.2d 450 (Tex. App.—Corpus Christi, 1994, no writ) ............................. 41

S. *Union Co. v. City of Edinburg,*
129 S.W.3d 74 (Tex. 2003) .................................................................... 35

*State Dept. of Highways and Public Transp. v. Cotner,*
845 S.W.2d 818 (Tex. 1993) (per curiam) ........................................ 30, 32

*State v. Laredo Ice Co.,*
96 Tex. 461, 73 S.W. 951 (1903) ............................................................ 34

*State v. Malone*,
853 S.W.2d 82 (Tex. App.—Houston [14th Dist.] 1993, writ denied) ....... 21-23, 25

*Strackbein v. Prewitt,*
671 S.W.2d 37 (Tex. 1984) ..................................................................... 28

*Strickland v. Lake,*
163 Tex. 445, 357 S.W.2d 383 (1962) ..................................................... 39

*Terry v. Zachary*,
272 S.W.2d 157 (Tex. Civ. App.—San Antonio 1954, writ ref'd n.r.e.) ............... 24

*Waffle House, Inc. v. Williams,*
313 S.W.3d 796 (Tex. 2010) ............................................ 36, 39, 40, 41

*Walker v. Packer,*
827 S.W.2d 833 (Tex. 1992) (orig. proceeding) .................. 20, 28, 31. 41

*Wetzel v. Barnes,*
691 S.W.2d 598 (Tex. 1985) .................................................................. 17

**Rules/Statutes**

Act of May 25, 1991, 72d Leg., R.S., ch. 901, § 42, art. 4.03, 1991 Tex. Gen. Laws 3203 (amended 2003) (current version at TEX. BUS. ORG. CODE ANN. §101.114 (West Pamph. 2011) ................................................................ 11

Act of June 16, 1987, 70th Leg., 1 C.S., Ch. 2, 1987 Tex. Gen. Laws 42-43 (amended 1995) ..................................................................................... 25

Act of May 18, 1995, 74th Leg., R.S., Ch. 136, 1995 Tex. Gen. Laws 974 (repealed 2001) ...................................................................................... 25

Tex. Const. Art. I, § 13 ..................................................... 34, 35

Tex. Civ. Prac. & Rem. Code Ann. §82.005 (Vernon 2014) ......................................... 25

Tex. R. App. P. 44.1 ..................................................... 33

Tex. R. Civ. P. 41 ..................................................... 30

Tex. R. Civ. P. 166a(c) ..................................................... 8

Tex. Water Code §7.101 (Vernon 2014) ..................................................... 8

# STATEMENT OF THE CASE

*Nature of the Case*:

Appellee originally filed this statutory enforcement action against White Lion Holdings, LLC, and its sole member, Appellant Bernard Morello. (CR at 33.) In the action, Appellee sought both monetary damages and injunctive relief against White Lion and Appellant for their alleged failure to comply with a previously-ordered compliance plan relating to groundwater monitoring. (*Id*.)

*Course of Proceedings*:

On August 23, 2013, Appellee filed its motion for final summary judgment as to White Lion only on each of these claims, and set same for hearing on September 19, 2013. (CR at 44.) On January 21, 2014, Appellee filed its motion for final summary judgment as to all claims against Appellant. (CR at 569.) Both White Lion and Appellant timely filed their summary judgment responses on September 11, 2013 (CR at 307) and February 13, 2015, respectively (CR at 901.)

*Trial Court's Disposition of Case*:

The trial court granted Appellee's motion for summary judgment against White Lion on September 19, 2013 (CR at 568) and severed its claims against White Lion from its claims against Appellant. On April 14, 2015, the trial court granted Appellee's motion for summary judgment and entered final judgment in the case. (CR at 1458.)

*Post-Judgment Filings/Court's Disposition*:

Appellant timely-filed a motion for new trial on May 15, 2015. (CR at 1463.) The trial court denied same by written order on June 2, 2015 (CR at 1769.) Appellant timely filed its notice of appeal on July 10, 2015 (CR at 1772.)

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument in this case. Oral argument would assist this Court in in consideration of the issues contained herein as well as the procedural posture of the case involving such issues. As such, oral argument will be of assistance to the Court in its decision-making process.

## ISSUES FOR REVIEW

### ISSUE ONE

Whether the trial court's grant of summary judgment against Morello was error requiring reversal of such judgment and remand of the case for a new trial?

### ISSUE TWO

Whether the trial court abused its discretion and committed harmful, reversible error by denying Morello's Motion for New Trial based on the erroneous severance of the State's claims against White Lion Holdings, LLC from its identical claims against Morello?

### ISSUE THREE

Whether the trial court abused its discretion and committed harmful, reversible error by denying Morello's Motion for New Trial based on newly discovered evidence?

**STATEMENT OF FACTS**

**I.      BACKGROUND**

**A.      The History of the Property Involved in this Case**

The case below involves a statutory enforcement action against Appellant Bernard Morello (hereinafter "Morello") for his limited liability company's alleged violations of Texas Water Code section 7.101.  (CR at 4.)  Morello's limited liability company is White Lion Holdings, LLC ("White Lion"), which is the owner of the real property and improvements located at 2010 Spur 529 in Rosenberg, Texas (the "Property").  (CR at 1670.)  The Property was originally owned by Vision Metals, Inc. ("Vision").  (*Id*.) While the Property was owned by Vision, it became contaminated and, on January 12, 1988, Vision received a permit from the Texas Commission on Environmental Quality ("TCEQ") for an Industrial Waste Management Site (Permit No. HW-50129-001).  (CR at 727.)  A compliance plan (CP-50129) was issued on the same day to address the monitoring and cleanup of the contaminated groundwater at the Property.  (CR at 758.)

Vision subsequently entered into modifications of the plan (on March 15, 1995 and November 16, 1999) before filing for bankruptcy in 2000.  (CR at 1613.)  For the three years prior to the bankruptcy, Vision was wholly noncompliant with its permit and the compliance plan.  (CR at 1604.)

**B.      Morello Subsequently Obtains the Purchase Rights for the Property and Transfers Same to White Lion; White Lion Purchases the Property in April 2004**

On February 27, 2004, after successfully bidding on the Property at a bankruptcy

1

auction, Morello entered into a contract to purchase the Property ("Purchase Agreement"). (CR at 1645.) On April 5, 2004, Morello assigned any and all of his rights in the Purchase Agreement to White Lion. (CR at 1669.) Closing on the sale of the Property occurred on April 6, 2004 between Vision and White Lion, with Vision conveying the property directly to White Lion via Special Warranty Deed recorded under Harris County Clerk document number 2004042731. (CR at 1670.) Therefore, **Morello was never the owner of the Property**, and White Lion was the only owner of the Property after Vision.

### C. White Lion Takes Transfer of the Compliance Plan and its Obligations from Vision

As mentioned supra, the Property was subject to the provisions of CP-50129 dating back to 1988 for contamination caused by Vision. (CR at 758.) Effective June 23, 2004, the rights and obligations of CP-50129 were transferred from Vision to White Lion. (CR at 1531.) Moreover, and as part of the Purchase Agreement, the financial assurance provided to the TCEQ by Vision under CP-50129 was included in the purchase and assigned to White Lion. (CR at 1534.) Thus, it cannot be disputed that White Lion was at all times the owner and operator of the Property as well as the permittee with respect to CP-50129.

### D. After White Lion's Purchase of the Property, Much of the Infrastructure Related to CP-50129 Was Removed or Destroyed by Third Parties

The Purchase Agreement specifically excluded personal property, which included pipe manufacturing machinery and other items. (CR at 1520-21; 1647, 1656, 1669.)

This personal property was sold separately from the real estate that White Lion purchased at the bankruptcy auction. (*Id*.)

As part of the bankruptcy sale, there were thirty-eight additional buyers of the personal property on site, none of whom were related to White Lion or Morello. (CR at 1550.) Many of these buyers and their contractors caused major damage to the Property, particularly to the electrical, water, air, and gas systems. (*Id*. at 1606.) Although Morello closely monitored the removal process and attempted to protect the Property as much as possible, (CR at 1555-56), extensive damage was done to the utilities and infrastructure:

> The Corrective Action System, the system itself, the functioning -- these are just fixtures here. This is just a pipe that runs into the ground. All the internet work that runs it is all gone. It was damaged at the time that the buyers were there. The equipment was gone. The pipes were cut. Electricity was cut. I've already went over all that. It was destroyed.

(*Id*. at 1606.) Following the conclusion of the removal process, and in the words of Morello, the Property resembled a "war zone." (*Id*. at 651.)

**E.     Given the Scope and Cost of Repairs, White Lion Was Unable to Comply With the Remedial Elements of CP-50129 or Post Proof of Financial Assurance**

With repair estimates at over $1 million (*id.* at 1552), White Lion did not have the financial ability to replace the utilities and remediation system that were destroyed by the personal property buyers, much less the additional funds to substantially comply with CP-50129. (*Id*. at 1524-25, 1547-48, 1550-51, 1554, 1564-1566, 1569, 1578-80, 1592-93, 1598-1600, 1602, and 1606-07.) Moreover, White Lion was unable to afford the premium for financial assurance required under the Texas Administrate Code. (*Id*. at

3

1539.) Given that the damage to the remediation infrastructure was beyond White Lion's control and could not have been prevented by its due diligence, substantial compliance with CP-50129 and its financial assurance requirement was impossible. (*Id*. at 1539-40.)

F. **The State Files Suit Against White Lion and Subsequently Adds Morello in His Individual Capacity**

Appellee filed suit against White Lion on April 14, 2006, seeking injunctive relief and statutory penalties related to White Lion's failure to fully comply with CP-50129 and the related financial assurance requirements. (CR at 4.) The essence of this suit is as follows: (1) Vision originally received a Class 1 permit from the State to operate the Property as an Industrial Waste Management Site (CR at 197, 36); (2) in connection with this permit, Vision was required to adhere to CP-50129 which mandated monitoring and cleanup of the contaminated groundwater at the Property and maintenance of $574,000 in financial assurance for operation of the cleanup (CR at 36, 762, 777); (3) when the State approved the transfer of Vision's permit to White Lion, While Lion became the permittee and thus responsible for compliance with CP-50129 (CR at 37, 816); (4) White Lion subsequently failed to substantially comply with CP-50129 resulting in the State filing suit for violation of Texas Waster Code section 7.101 et seq., and seeking injunctive relief and fines against White Lion, and later, Morello (CR at 33.)

On August 23, 2013, the State obtained an interlocutory summary judgment against White Lion, which simultaneously became final based on the severance clause in the judgment. (CR at 568.) Two months later, Appellee moved for summary judgment against Morello in his individual capacity, with the Court granting said motion and

4

entering a second final summary judgment on April 14, 2015.  (CR at 1458.)

**G.     Morello Files His Motion for New Trial Which the Trial Court Denies**

On May 14, 2015, Morello filed his motion for new trial.  (CR at 1463.)  In his Motion for New Trial, Morello re-urged his prior corporate shield defense asserted in the summary judgment proceeding, and argued that judgment against him in his individual capacity was improper.  (CR at 906-13, 1467-75.)  In his Motion for New Trial, Morello also argued that new trial was required based on improper severance and newly-discovered evidence.  For the reasons discussed below, the trial court's grant of summary judgment was reversible error as was its subsequent order denying a new trial.

## SUMMARY OF THE ARGUMENT

In *Shook v. Walden*, this Court analyzed the legislative history of the statutory-liability shield for members of Texas limited liability companies. Based upon its analysis, this Court reluctantly assumed that the statutory-liability shield then in effect was not absolute but subject to a **single veil-piercing exception**: proof that the member used the LLC to perpetrate actual fraud for his direct personal benefit. In this case the State did not seek to pierce the veil or even allege that Morello committed a tort of any kind. Rather, the State argued that Morello's liability was direct and resulted from the mere fact that Morello was a "person" in violation of Texas Water Code section 7.101 and thus caused the trial court to erroneously grant summary judgment.

Moreover, and assuming that *Shook* is incorrect or inapposite such that no veil-piercing was required to find Morello individually liable, the State nevertheless failed to prove the elements of its claim and thus an entitlement to summary judgment. As authority for its claim that Morello was subject to individual liability under Water Code section 7.101, the State relied upon three primary cases. While these decisions recognize individual liability against corporate agents, such liability is either predicated upon proof that the agent committed a tort or the existence of direct statutory language authorizing individual liability against the agent of an entity—none of which is applicable in this case. Either way, the trial court's order of summary judgment was error.

The trial court also committed an abuse of discretion by severing the State's claims against White Lion from the identical claims against Morello. As the record in this case demonstrates, the State first took summary judgment for damages and injunctive

relief against White Lion for violations of CP-50129. After the trial court severed this judgment, the State then obtained a second judgment for damages and injunctive relief against Morello based on the identical allegations and facts. Under Texas Rule of Civil Procedure 41, however, a trial court abuses its discretion by either (1) severing claims after they have been submitted to the trier of fact or (2) severing claims which are so interwoven with other claims in the case that they involve the same facts. By severing the State's claims against White Lion in a second suit, the trial court's order was error for either reason. And this error was harmful as it resulted in an impermissible double recovery for the State as well as an excessive fine against Morello in violation of the Texas and United States Constitutions.

Finally, the trial court's denial of Morello's Motion for New Trial based on newly-discovered evidence was another abuse of discretion. Under Texas law, a party seeking a new trial on grounds of newly-discovered evidence must demonstrate to the trial court that (1) the evidence has come to its knowledge since the trial, (2) its failure to discover the evidence sooner was not due to lack of diligence, (3) the evidence is not cumulative, and (4) the evidence is so material it would probably produce a different result if a new trial were granted. Morello's Motion for New Trial established each of these elements yet the trial court denied same. For any or all of these reasons, then, the trial court's summary judgment requires reversal.

# ARGUMENT

## ISSUE ONE

## I.      THE TRIAL COURT'S SUMMARY JUDGMENT WAS ERROR

### A.      Summary Judgment Standard of Review

The party moving for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985).  If a plaintiff moving for summary judgment establishes each element of its cause of action as a matter of law, *see MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986), the defendant must then come forward with summary judgment evidence sufficient to raise a fact issue on each element of its affirmative defense to avoid summary judgment. *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984).

### B.      The Trial Court's Grant of Summary Judgment Was Error Because the State Failed to Prove Its Cause of Action as a Matter of Law

The State's summary judgment motion was clumsy, providing little legal authority but focusing primarily on facts.  The motion began with the premise that, under Texas Water Code section 7.101, "a person" incurs civil liability where he "cause[s], suffer[s], allow[s], or permit[s] a violation of a statute within the commission's jurisdiction or a rule adopted or an order or permit issued under such a statute."[1]   (CR at 587.) Anticipating that Morello would prove up his statutory shield defense and defeat summary judgment, the State then correctly conceded that under Texas law, "the

---

[1] Texas Water Code section 7.101 provides as follows: "A person may not cause, suffer, allow, or permit a violation of a statute within the commission's jurisdiction or a rule adopted or an order or permit issued under such a statute." (Vernon 2014)

structure of a limited liability company shields its members from liabilities and obligations of the company." (CR at 587-88.) In fact, the State proved up this defense in its own motion, providing evidence and argument showing that Morello is the sole manager and owner of White Lion, LLC. (CR at 575, 584, 589.)

Realizing this problem, the State cited various appellate decisions for the proposition that this statutory defense does not shield LLC members and their agents from liability where they "personally commit fraudulent or wrongful acts."[2] (CR at 588.) Focusing on the "wrongful" language, the State then proceeded to argue as follows: (1) White Lion's failure to comply with CP-50129 gave rise to liability under Texas Water Code section 7.101 (CR at 587); (2) Morello was the sole member of White Lion and thus responsible for its operation and non-compliance with CP-50129; and (3) by not allowing White Lion to comply with CP-50129, Morello necessarily subjected himself to personal liability under section 7.101. (CR at 588-89.)

In essence, then, the State argued that any breach of duty or statutory violation by the member of an LLC (i.e., "wrongful acts") automatically subjects the actor to liability. As discussed below, this completely eviscerates the statutory shield available to members of an LLC and flies in the face of Texas law. Accordingly, the State failed to establish Morello's liability under Water Code section 7.101 so that summary judgment was error.

---

[2] The State did not argue that Morello committed any *fraudulent* act. Instead, it argued that White Lion's/Morello's failure to comply with CP-50129 was in violation of the Water Code, and thus a *wrongful* act which subjected him to direct liability.

9

**1.** **Under This Court's Decision in *Shook v. Walden*, Morello's Liability Could only Be Established through Veil Piercing/Fraud as Opposed to the State's Theory of Direct Liability Under the Texas Water Code**

This Court's decision in *Shook v. Walden*, which discusses the evolution of member/manager liability in cases involving Texas limited liability companies, is dispositive of this appeal. *See* 368 S.W.3d 604, 613–14 (Tex. App.—Austin 2012, pet. denied). In *Shook*, the Waldens entered into a pair of contracts with S&J Endeavors, LLC—a two-member LLC doing business a builder/developer. *Id*. at 607. S&J's members were Stanley Shook and Patrick Jaehne. *Id*. The first contract called for S&J to convey the Waldens a tract of land in Bastrop, Texas for $62,000. *Id*. Under the second contract, S&J agreed to build the Waldens a home on the tract for a price less than $429,000. *Id*. at 608.

In September 2006, the Waldens transmitted a check for $62,000 to S&J as payment for the lot at which point S&J began building on same. *Id*. Meanwhile, various title issues arose which left S&J unable to convey clear title on the lot to the Waldens. *Id*. at 608. According to the Waldens, S&J's failure to convey the lot was the result of Jaehne holding the conveyance as leverage to secure payment of disputed amounts owed under the construction contract. *Id*.

After completion of the house, the Waldens' sued S&J, Jayne, and Shook on numerous common law and statutory claims related to conveyance of the deed and alleged misrepresentations and fiduciary breaches related to the construction. *Id*. Following a jury trial, the court entered judgment against S&J on all claims and against Jaehne and Shook jointly and severally based upon veil-piercing theories. *Id*. at 610. On

10

appeal, Shook argued that joint and several liability against him was error given his status as a member of S&J. *Id.* Specifically, Shook argued that under the law in effect at that time, the statutory shield afforded members of LLC could only be pierced based on a showing that he used S&J to perpetrate an actual fraud on the Waldens which was for his direct, personal benefit. *Id.* at 611.

In addressing this issue, this Court underwent an exhaustive examination of the standard for piercing the corporate veil of an LLC that was incorporated prior to September 1, 2011. *See id.* at 368 S.W.3d at 613–14. This Court began by noting that the Texas Legislature first authorized the creation of LLCs through its 1991 enactment of the Texas Limited Liability Company Act ("LLC Act"). *Id.* at 613. This Court then recited the following provisions from article 4.03 of the LLC Act relating to liability:

> Art. 4.03. A. Except as and to the extent the regulations specifically provide otherwise, a member or manager is not liable for the debts, obligations or liabilities of a limited liability company including under a judgment decree, or order of a court.
>
> . . . .
>
> C. Parties to actions. A member of a limited liability company is not a proper party to proceedings by or against a limited liability company, except where the object is to enforce a member's right against or liability to the limited liability company.

*Id.* at 613 (citing Act of May 25, 1991, 72d Leg., R.S., ch. 901, § 42, art. 4.03, 1991 Tex. Gen. Laws 3203 (amended 2003) (current version at TEX. BUS. ORG. CODE ANN. §101.114 (West Pamph. 2011)) (copy found at Tab "C").

In an attempt to ascertain the Legislature's intent as to whether these provisions constituted an **absolute shield** to **all liability** for an LLCs members/managers, this Court

11

then noted that: (1) Article 4.03 and its successors "made no mention of veil-piercing principles as an exception to limited liability or whether or how such remedies might be applied against LLCs"; but that (2) in 2011, the Legislature finally added a section to the current version of the LLC Act which adopted for LLCs the veil-piercing restrictions applicable to corporations. *Id*. at 614. For good reason, then, this Court found plausible that the statutory liability-shield provided to LLCs under article 4.03 was **absolute in nature** and not susceptible to even common-law veil piercing. After noting that Shook did not urge this absolute shield but instead conceded that "the veil of an LLC, like that of a corporation, may be pierced in some circumstances," this Court reluctantly *assumed* the liability shield provided by article 4.03 was not absolute but was subject to a **single veil-piercing exception**: proof that the individual used the LLC form to perpetrate actual fraud for the individual's direct personal benefit. *See id*. at 614.

In summary, the *Shook* Court has held that, for LLCs formed before 2011 and subject to article 4.03, member/manager liability for LLC obligations can only arise through veil piercing demonstrating fraud perpetrated for the member/manager's direct personal benefit. White Lion was formed in 2004, with Morello as its sole manager. (CR at 636, 569, 575, 584) Thus, and like S&J, White Lion's "actions at issue here are governed by [the LLC Act] rather than the [Texas Business Organizations Code]. *See id*. at 413 & n.12. Applying the analysis in *Shook*, then, Morello could only have been liable for White Lion's liability under Water Code section 7.101 based on a showing that he used the LLC to perpetrate actual fraud for his direct personal benefit. *See id*. at 614.

The State, however, never pleaded, argued, or proved any type of veil-piercing

theory or that Morello used the LLC to perpetrate a fraud for his personal benefit. (CR at 905, 911.) At the summary judgment hearing, the State's attorney specifically disclaimed reliance on such a theory when he stated the following "[t]o be clear the [S]tate's not seeking to pierce the corporate veil."[3] (Tab 6 at 14.)[4] Instead, the State argued that Morello's liability was direct and flowed from the mere fact that he was a "person" in violation of Texas Water Code section 7.101. As noted in *Shook*, however, Morello's individual liability required the State to plead and prove alter ego liability based on fraud. The State did not even attempt to meet this burden of pleading and proof. Accordingly, the State failed to prove the elements of its cause of action against Morello so that Court's grant of summary judgment was error.

2. **Assuming *Shook's* Holding Requiring Veil Piercing/Fraud Doesn't Control in this Case, Establishing Liability Under the *Miller v. Keyser* Line of Authority as the State Argued Requires Proof of *Tortious Conduct* by the Corporate Agent**

Even assuming that *Shook* does not restrict Morello's personal liability as discussed supra, the State's basis for summary judgment was not a legally sufficient one entitling it to judgment. In its motion, and contrary to this Court's holding in *Shook*, the State started with the position that "[t]he corporate veil is not required to be pierced in an action brought against an individual corporate agent for his fraudulent or wrongful acts." (CR at 588.) From this premise, the State argued that "when a statute provides for individual liability, as does [section 7.101 of] the Water Code, an individual corporate

---

[3] The State's failure to plead alter ego liability was not an oversight or negligence, but a deliberate scheme to wrongfully obtain a double recovery and violate Morello's rights against excessive fines or penalties set forth in Article I, section 13 of the Texas Constitution (discussed more fully in Issue Two).

[4] Morello has requested supplementation of the reporter's record with the transcript of proceedings from the summary judgment hearing.

officer may be held liable for his own violations." (*Id.*) In support of this proposition, the State cited to several appellate decisions, the most prominent being the Texas Supreme Court's decision in *Miller v. Keyser*. Morello will individually discuss and distinguish each of these authorities below. Before doing so, however, Morello will first turn to a full discussion of Texas Supreme Court case law leading up to the *Miller v. Keyser* decision.

### a. *Karl and Kelly Company v. McLerran*: Corporate Officers/Agents Only Liable Under Alter Ego Theory

In *Karl and Kelly Company Inc. v. McLerran*, the Texas Supreme Court addressed the issue of personal liability of corporate officers. *See* 646 S.W.2d 174 (Tex. 1983) (per curiam). In that case, the plaintiffs purchased a new home from Karl and Kelly Company, Inc., and subsequently sued both the company and its officers (Karl Simon and James Kelly) under the DTPA for construction defects. *Id.* at 174. When defendants failed to appear for trial, the court entered a post-answer default judgment in favor of plaintiffs. *Id.*

Following affirmance by the Dallas Court of Appeals, the Supreme Court granted writ of error. In their briefing, the individual defendants argued that summary judgment against them was improper because the plaintiffs had failed to plead or prove alter ego liability. *Id.* at 175. In reversing and remanding, the Supreme Court agreed, holding that liability as to corporate agents such Karl and Kelly was only proper upon pleading and proof that such agents were the alter ego of the corporation. *Id.* at 175.

### b. *Light v. Wilson*: Impliedly Overruling *McLerran* by Holding that Corporate Agents May Also Be Liable for Their Own Tortious Misconduct

In *Light v. Wilson* the plaintiff contracted with G-W-L Builders, Inc., for construction of a new home and deposited a substantial deposit with G-W-L for same. *See* 663 S.W.2d 813 (Tex. 1984). When G-W-L failed to take any action to begin construction, plaintiff sent a demand to G-W-L and its sole owner—Glen Light—for return of their money. *Id*. Light responded with a letter refusing to return the deposit. *Id*. Light's bases for refusing to return the deposit were that: (1) the delays in construction were due to the plaintiffs' inability to obtain financing and (2) G-W-L had spent too much money on the project to allow a refund. *Id*. at 814.

Plaintiffs subsequently filed suit against G-W-L and Light alleging fraud, conversion, and DTPA violations and obtained a verdict on the DTPA claim. *Id*. Following affirmance by the intermediate court of appeals, the Supreme Court granted writ of error and reversed as to liability against Light. *Id*. at 815. In so doing, the Court noted that: (1) there was no finding of fact that Light, individually, had violated the DTPA; (2) Light's personal liability was predicated on an alter ego theory; and (3) there were no pleadings to support a theory of recovery on alter ego or corporate veil piercing. *Id*. at 814. The Court then held that "[t]herefore, there being no finding of fact that Light violated the Deceptive Trade Practices Act, he cannot be personally liable." *Id*. Thus, the *Light* court impliedly overruled *McLerran* by holding that corporate agents could be found individually liable for their own tortious misconduct as well as under an alter ego finding.

**c.** ***Leyendecker & Associates v. Wechter*: Affirming *Light* and Upholding Corporate Agent Liability for His <u>Tortious Acts</u>**

In *Leyendecker & Associates, Inc. v. Wechter*, plaintiffs contracted for the construction of a townhome in Houston. *See* 683 S.W.2d 369, 371 (Tex. 1984). During negotiations for the home, a Leyendecker agent advised that the plaintiffs could buy a corner lot, which was slightly larger (2,475 square feet) than the standard lot in the development. *Id*. at 372. Plaintiffs' subsequently paid Leyendecker additional money in exchange for such lot. *Id*. Following closing, however, plaintiffs discovered that the actual size of their lot did not include the 2,475 additional square foot. *Id*. Plaintiffs subsequently complained to the Greater Houston Builders Association regarding the lot size discrepancy as well as certain building defects. *Id*. Leyendecker employee Chris Hilliard later responded on behalf of Leyendecker by falsely accusing the plaintiffs of urging Leyendecker to make fraudulent insurance claims. *Id*.

Plaintiffs subsequently sued Leyendecker for misrepresentation of the lot size and construction defects, and Leyendecker and Hillard for libel in connection with the false statement regarding insurance claims. *Id*. As to the libel claim, plaintiffs obtained a judgment, which the court of appeals affirmed. On writ of error, the Supreme Court considered Leyendecker's contention that "an employee who commits a tort while acting within the scope of his employment is not liable to the party injured." *Id*. at 375. Disagreeing, the Court cited to *Light* for the proposition that "[a] corporation's employee is personally liable ***for tortious acts*** which he directs or participates in during his employment." *Id*. (emphasis added). After noting Hilliard's affirmative and tortious act

of "penn[ing] the libelous letter," the Court affirmed. Consistent with its decision in *Light*, the Court thus affirmed the individual liability of a corporate agent based on his active, tortious conduct.

> **d.** ***Wetzel v. Barnes*: Reaffirming that Courts May Impose Personal Liability on Corporate Agents Where Agent Engages in <u>Affirmative Tortious Conduct</u>**

In *Wetzel v. Barnes*, the Supreme Court again visited the issue of personal liability for corporate agents. *See* 691 S.W.2d 598 (Tex. 1985). In that case, the plaintiffs entered into a contract with Barnes/Seagraves Development Company for the purchase of a remodeled home. *See id.* at 599. In connection with the contract, Michael Barnes and Patrick Seagraves made affirmative representations that the home's plumbing and air conditioning complied with local building code specifications. *Id.* After plaintiffs purchased the home they discovered that these systems did not function properly and brought suit against the corporation and Barnes/Seagraves individually for making false and misleading representations in violation of the DTPA. *Id.* at 599-600.

Following a bench trial, the court found for plaintiffs with the court of appeals reversing and rendering judgment for defendants. *Id.* at 599. On writ of error, however, the Supreme Court reversed the court of appeals judgment and affirmed the judgment of the trial court. With respect to the individual liability of Barnes and Seagraves, the Supreme Court noted that the record "contain[ed] evidence as to statements of both men upon which the trial judge could have relied in concluding that they each made oral misrepresentations." *Id.* at 601. Citing to *Light*, the Court then held that "there can be individual liability on the part of a corporate representative for misrepresentations made

17

by him." *Id*. Thus, and consistent with its precedent in *Light*, the Court again affirmed the individual liability of a corporate agent based on commission of ***tortious conduct***. *Id*.

### e. *Miller v. Keyser*: **Reaffirming** *Light* **and** *Weitzel* **and Holding that a Corporate Agent Is Personally Liable Only for His Own** <u>Fraudulent or Tortious Acts</u>

*Miller v. Keyser* involved another case under the DTPA brought by plaintiffs against a homebuilder—in this case D.B. Interests, Inc. ("DBI"). *See* 90 S.W.3d 712, 717 (Tex. 2002). In that case, the plaintiffs purchased a home from DBI. *Id*. at 715. The DBI sales agent handling all negotiations for the sale was Barry Keyser. *Id*. During negotiations, Keyser correctly represented to plaintiffs that the back 20 feet of the lot on which their home was to be built was encumbered by an easement. *Id*. However, Keyser concurrently misrepresented that this portion of the lot could be fenced in as part of the yard. *Id*. After plaintiffs purchased the lot and constructed a home on same, they fenced in the entire tract including the easement. *Id*. Subsequently, the Brazoria County Drainage District enforced its easement rights and required plaintiffs to remove the infringing portions of the fence at their own cost. *Id*.

Plaintiffs subsequently brought suit against DBI and Keyser for fraud and misrepresentations in violation of the DTPA. *Id*. The trial court later dismissed plaintiffs' claims against DBI as untimely so that plaintiffs' proceeded to trial against Keyser only. *Id*. After the jury found Keyser liable for misrepresentations, the intermediate court of appeals relied upon the Court's previous decision in *McLerran* and held that a corporate agent acting within the scope of his employment could not be personally liable under the DTPA. *Id*.

On petition for review, the Supreme Court began by reviewing the *McLerran*, *Light*, and *Barnes* decisions and noting that each involved the commission of a tortious act by the individual. *Id* at 717. After considering the facts of each, the Court agreed that its decision in *Light* overruled *McLerrran* and then held that "[o]ur holdings in *Light* and *Weitzel* comport with Texas' longstanding rule that a corporate agent is personally liable ***for his own fraudulent or tortious acts***." *Id*. (emphasis added). While the Court then noted that "the plain language of the DTPA is in harmony with this rule" because it "grants the homeowners a cause of action against 'any person' who violates the act," it ultimately justified its holding as follows:

> ***Agents are personally liable for their own torts***. There is no basis for concluding differently based on the claims brought under the DTPA. Accordingly, we hold that an agent may be held personally liable for his own violations of the DTPA.

*Id*. at 718 (emphasis added). Based on this holding, the Court noted that Keyser had personally violated the DTPA through various false, misleading, and deceptive acts and remanded the case back to the court of appeals. *Id*. at 720.

> **f.** **Because the State Never Pleaded, Proved, or Argued Tortious Conduct by Morello, the Court's Grant of Summary Judgment Imposing Personal Liability Against Morello Was Error**

Applying these principles to the present case leads to the conclusion that summary judgment against Morello for White Lion's violations was error. The State neither alleged in its petition nor argued in its summary judgment motion that Morello committed any type of fraud or tort in this matter. Indeed, the State expressly ruled out the possibility that its summary judgment basis could be construed as alleging the

19

commission of a tort by Morello:

> Morello asserts that compliance with the Compliance Plan has been caused by or otherwise rendered impractical by third parties. ***This matter is not a tort action.*** This is a statutory enforcement action brought against Morello as operator and sole decision maker of White Lion . . . .

(CR at 597, emphasis added.)

Thus, and in an effort to prevent Morello from establishing an affirmative defense to the State's case (i.e., that White Lion's failure to comply with CP-50129 was due in part to the acts of responsible third parties—CR at 914-915), **the State took the position that such defense wasn't available because the case didn't involve a tort**. So even assuming that this Court's decision in *Shook* is wrong and that *Keyser* could support individual liability for actions by members taken on behalf of an LLC,[5] this common-law doctrine has no application in this case because it did not involve the commission of a tort by Morello. Accordingly the trial court's entry of summary judgment was error as the State failed to prove the liability element of its claim under Water Code section 7.101. Moreover, the trial court's denial of Morello's motion for new trial, in which Morello raised this same issue, constitutes a failure to analyze or apply the law correctly, which in turn constitutes an abuse of discretion requiring a new trial. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding)).

---

[5] Morello also argues that the Keyser line of authority is distinguishable and inapplicable for the following reason. First, the *Light, Leyendecker, and Wetzel* cases were decided by the Texas Supreme Court prior to the Texas Legislature's 1991 enactment of the LLC Act and thus only governed liability for the tortious conduct of corporate agents. While *Keyser* was handed down in 1992 and thus after enactment of the LLC Act, it too is inapposite. Like *Light, Leyendecker, and Wetzel*, *Keyser* did not involve liability of a member of an LLC but of the agent of a corporation. As this Court intimated in *Shook*, the legislative history of the LLC Act clearly implies that, unlike the statutory provisions governing liability of corporate agents, the LLC Act provided an absolute shield to liability for members of an LLC. Thus, and to the extent that the *Keyser* line of cases allowed for individual tort liability against corporate agents, such holding cannot be extended to individual liability against members of an LLC such as Morello.

20

Finally, and in an attempt to avoid the requirement that Morello have committed fraud or a tort, the State argues that "the actions [of the member of an LLC] are viewed, not in the context of a tort, but in the context of whether such actions amount to causing, suffering, allowing, or permitting a violation of law" as set forth in Texas Water Code section 7.102. (Pl's MSJ Reply at 5.) But under the *Keyser* line of cases, actual tortious conduct is required to impose personal liability on a corporate agent. Indeed, *Keyser* is clear that, notwithstanding the DTPA's language regarding the liability of "a person,' liability was premised on the agent's **commission of a tort**.

As noted by Texas courts, this is not an arbitrary requirement but one based on the policy of preventing tortious acts: "[t]he purpose of individual liability in the corporate setting is to prevent an individual from using the corporate structure or agency law as a blanket to insulate himself from liability from his otherwise tortious conduct." *See Physio GP, Inc. v. Naifeh*, 306 S.W.3d 886, 889 (Tex. App.—Houston [14th Dist.] 2010, no pet.). In summary, the trial court's judgment holding Morello individually liable for White Lion's administrative code violations is both unsupported by Texas common law *and* runs counter to this policy because such liability is not of a tortious character. Accordingly, reversal of the summary judgment is required.

### 3. The *State v. Malone* Decision Is Inapposite as It Affirmed Individual Liability Against Corporate Officers Based Upon Their Commission of "Environmental Torts"

Another appellate decision on which the State relied to establish personal liability against Morello is *State v. Malone*, 853 S.W.2d 82 (Tex. App.—Houston [14th Dist.] 1993, writ denied). (CR at 589.) In fact, the State relied on *Malone* even more than

*Kaiser*, referring to the former as "the seminal case on individual liability in a statutory environmental enforcement action." (CR at 1754.) As discussed below, however, *Malone* offers **no support** for imposition of individual liability against Morello, but like *Keyser* requires reversal of the trial court's judgment.

*Malone* involved an environmental action brought against a hazardous waste disposal plant (Malone Service Company "MSC") as well as its president and plant manager. *See id*. at 83. In that case, the Texas Water Quality Board had previously issued MSC a permit authorizing deep well injection of waste materials into an earthen pit. *Id*. at 83-84. On August 17, 1977, the TWQB's successor agency issued an order amending the permit and requiring MSC to construct, within nine months, a concrete separator for pretreatment of waste which was to replace the earthen pit. *Id*. at 84. Upon completion of the separator and following an 18-month period, MSC was too discontinue use of the pit. *Id*. The Board twice extended the deadline for cessation of the pits use, but on September 19, 1979, finally ordered that MSC cease receiving any waste materials and close the pit within nine months. *Id*.

When MSC failed to comply with the order, the Texas Water Commission brought suit against MSC and its president and plant manager seeking penalties. *Id*. at 83. During trial, the jury heard evidence that in violation of the TWC's order, MSC employees: covertly continued to pump sludge into the pit; used code phrases in their logbooks to disguise the illegal pumping in an attempt to conceal their activity from outsiders; cut tears into a TWC-mandated tarp covering for the pit to allow illegal pumping to continue; and routinely dumped hazardous waste into the pit. *Id*. at 84.

Following trial, the jury assessed more than $3 million in penalties against MSC and its plant manager and president.

On appeal, MSC contended that "there can be no individual liability for its president or plant manager because they did not own the [deep well injection'] permit." *Id*. at 84. In analyzing this contention, the court first referenced the language of Texas Water Code section 27.101(a) which stated that "[a] person who violates any provision of a permit issued under this chapter" was subject to liability, and noted that Texas law defined a "person" to include natural persons. *Id*. at 84. The court juxtaposed this authority against article 5.069-1.06 of the Texas Revised Civil Statutes which provided that "any person who contracts for, charges or receives interest which is greater than the amount authorized [by statute]" was subject to civil liability, but noted an appellate decision (*Wartman v. Empire Loan Company*) limiting such liability to a principal only. *Id*.

After setting forth these authorities, the court then set forth the parties' position and its decision affirming individual liability as follows:

> Accordingly, [MSC] conclude[s] that Section 27.101 does not impose liability for a "person" who does not own the permit, although he or she acts as agent, aider or abettor in violating the act. The State distinguishes *Wartman* by noting that its controlling issue was whether the collection agents' receipt of usurious interest was tortious. 101 S.W. at 500. While usury "has a contractual flavor," an environmental tort is more analogous to a situation in which a corporate officer who participates in or directs the commission of a tort may be held personally liable. *See, e.g., Leyendecker & Assoc., Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1984). Liability is based on the agent's own actions, not his status as agent. *Id*.

*Id*. at 85. In summary, then, the *Malone* court affirmed the trial court judgment imposing individual liability against MSC's corporate agents for violation of former Water Code

Section 27.101. <u>According to the State</u>, the *Malone* court's holding stands for the simple proposition that "when an individual corporate officer takes personal action to violate or direct the violation of state environmental laws or permits, such individual can be held personally and individually liable for his actions." (CR at 589.)

Such a facile reading of *Malone*, however, ignores the obvious reasoning underlying the decision as well as the authorities cited therein. In rejecting MSC's argument that its agents were not shielded from liability under the statute, the court drew a distinction between individual liability based on contract as opposed to tort. The court even cited to *Leyendecker* at jump page 375 wherein the Texas Supreme Court held that "[a] corporation's employee is personally liable ***for tortious acts*** which he directs or participates in during his employment." *See Leyendecker*, 683 S.W.2d 369, 375 (emphasis added). Thus, the basis for the *Malone* court's decision was not that MSC's corporate agents merely engaged in a violation of the statute at issue as the State argued. Rather, the *Malone* court analogized that the individual defendants' liability was closer to an "environmental tort" (for which corporate agents may be personally liable under *Leyendecker*) than a contractual breach (for which corporate agents have long been shielded under Texas law[6]), and upheld liability on that basis.

Thus, and to the extent that *Malone* has any precedential authority, it stands for the proposition that corporate agents who engage in "environmental torts" can be individually liable for their actions. But unlike the individual defendants in *Malone*,

---

[6] *See Maxey v. Citizens Nat'l Bank of Lubbock*, 507 S.W.2d 722, 726 (Tex. 1974) (citing *Terry v. Zachary*, 272 S.W.2d 157 (Tex. Civ. App.—San Antonio 1954, writ ref'd n.r.e.) for the proposition that "[i]t has been held that an officer or director may not be held liable in damages for inducing the corporation to violate a contractual obligation, provided that the officer or director acts in good faith and believes that what he does is for the best interest of the corporation.").

24

Morello committed no tort—environmental or otherwise. In *Malone*, the individual defendants were involved in routine dumping of hazardous wastes in MSC's earthen pit and actively concealing same. *See Malone*, 853 S.W.2d 82, 83-84. Such action was clearly consistent with the definition of "environmental tort" as that term has been defined under Texas Law.

Specifically, the current Texas Civil Practice and Remedies Code provides that "[t]his section does not apply to a cause of action based on a toxic or <u>environmental tort</u> as defined by sections 33.013(c)(2) and (3)." TEX. CIV. PRAC. & REM. CODE ANN. §82.005(d)(1) (Vernon 2014) (emphasis added). The referenced section of section 33.013(c)(2), effective September 2, 1987 and continuing through the time of decision in *Malone*, defined an environmental tort as "personal injury, property damage, or death . . . caused by the ***depositing, discharge, or release into the environment*** of any hazardous or harmful substance as described in Subdivision (3)." *See* Act of June 16, 1987, 70th Leg., 1 C.S., Ch. 2, 1987 Tex. Gen. Laws 42-43 (amended 1995) (attached at Tab 4). Although Chapter 33 was amended in 1995, section 33.013(c)(2) retained the same definition of environmental tort until the section was repealed in 2001. *See* Act of May 18, 1995, 74th Leg., R.S., Ch. 136, 1995 Tex. Gen. Laws 974 (repealed 2001) (attached at Tab 5).

Given this longstanding definition of "environmental tort," the *Malone* defendants clearly engaged in acts meeting this definition so that the *Malone* court properly imposed individual liability against them. Conversely, it is undisputed that Morello did not "deposit, discharge, or release" any hazardous substances into the Property or environment at large. Rather, Vision was the party responsible for committing the

environmental torts for which CP-50129 was imposed. (CR at 1463.) By contrast, Morello's "crime" was largely one of **inaction/omission** in connection with CP-50129 which mandated monitoring and cleanup of the contaminated groundwater at the Property and maintenance of $574,000 in financial assurance for operation of the cleanup (CR at 36, 762, 777). Morello's only alleged **action** relating to noncompliance with CP-50129 were that he: (1) removed the facility's domestic wastewater treatment plant from the Property; (2) removed the Acid Neutralization and Treatment System ("ANTS") from the Property; and (3) threw away, or directed to be thrown away, monitoring well protective housing caps. (CR at 585-86.)

Even assuming the truth of these allegations, they do not constitute commission of an environmental tort as Morello did not "***deposit, discharge, or release into the environment***" any substance, much less and "hazardous or harmful substance." Thus, and to the extent that it has any precedential value in light of *Shook, Malone* is clearly distinguishable and does not support imposition of summary judgment in this case. Accordingly the trial court's entry of summary judgment was error as the State failed to prove the liability element of its claim under Water Code section 7.101.

4. **The *Health Enrichment* Decision Is Inapposite as It Affirmed Individual Liability Against a Corporate Officer Based Upon a Statutory Exception**

In its summary judgment motion, the State also cited to an unreported decision of this Court styled *Health Enrichment and Longevity Institute, Inc. v. Texas* for the proposition that Morello could be held personally liable for White Lion's Texas Water Code violations. *See* 2004 WL 1572935 (Tex. App.–Austin 2004, no writ) (not reported

26

for publication); (CR at 589.) The case involved an administrative action brought by the State against Health Enrichment and Longevity Institute, Inc. ("Brazos Oaks"), an assisted living facility, and its president and sole owner—Ms. Linda Milam. *See id*. at *1. The basis for the administrative action was that the Brazos Oaks had been doing business without a license as required under the Assisted Living Facility Licensing Act ("ALFLA") codified at Texas Health & Safety Code Chapter 247. *See id*. at *1, *8. Following a bench trial, the trial court entered judgment against Brazos Oaks and Milam assessing monetary penalties and an order permanently enjoining defendants from operating the facility without a license. *See id*. at *2, *6.

On appeal, Milam challenged the judgment to the extent that it rendered her individually liable for her actions taken on behalf of Brazos Oaks. *See id*. at 8. Without significant discussion, this Court rejected the contention, noting that section 247.045(a)-(c) of the ALFLA authorized imposition of monetary penalties within the range allowed. *See id*. The Court also noted that Milam was the sole owner of the facility, and that this fact gave rise to her individual liability under the ALFLA. *See id*. Milam's individual liability under the ALFLA was due to section 247.045(h) which specifically authorized imposition of joint and several liability for penalties against "***any owner, other controlling person, or the affiliate of the person found liable***." *See* TEX. HEALTH & SAFETY CODE ANN. §247.045(h) (Vernon 2014) (emphasis added).

Thus, Milam's individual liability under the ALFLA for Brazos Oaks' violations resulted from a <u>statutory exception</u> to the <u>statutory liability shield</u> otherwise afforded to officers of corporations and members of LLC's. Of course, this exception only applies to

27

liability incurred under the ALFLA, while the Water Code does not contain an analogous provision. Accordingly, the *Health Enrichment* decision is easily distinguishable and does not support the trial court's entry of judgment against Morello individually for violation of Texas Water Code section 7.101. For all of these reasons, the trial court's entry of summary judgment was error that requires reversal.

## ISSUE TWO

**II.    The Trial Court's Denial of Morello's Motion for New Trial For Improper Severance of Parties Was Error**

### A.    Standard of Review

An appellate court reviews the denial of a motion for new trial under an abuse-of-discretion standard. *Strackbein v. Prewitt*, 671 S.W.2d 37, 38 (Tex. 1984). An abuse of discretion occurs if the trial court acts without reference to any guiding rules or principles. *Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997). As to legal issues, however, the trial court has no discretion in determining what the law is or in applying the law to the facts. *In re Paso Del Norte Surgery Center*, 281 S.W.3d 521, 524 (Tex. App.—El Paso 2008, orig. proceeding) (citing *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding)). A failure by the trial court to analyze or apply the law correctly constitutes an abuse of discretion. *Id*. Thus, while a trial court generally has discretion in determining whether to grant a new trial, no such discretion exists when, as in the present case, the movant's basis for a new trial is that the court rendered judgment based on an improper application or interpretation of law.

**B.      The Severance Proceedings in the Trial Court**

In April 2006, the State filed this statutory enforcement action against White Lion pursuant to Texas Water Code section 7.101 et seq.  (CR at 4.)  In the action, the State sought both monetary damages and injunctive relief against White Lion for its failure to comply with CP-50129 based on Water Code section 7.101, et seq.  (*Id*.)  On January 22, 2007, the State amended its petition asserting the same claims and adding Morello individually.  (CR at 19.)

On August 23, 2013, the State filed its motion for summary judgment as to White Lion only on each of these claims along with a conditional motion for severance, and set same for hearing on September 19, 2013.    (CR at 44.)    The trial court granted Appellant's motion for summary judgment against White Lion on September 19, 2013 (CR at 563).  In that judgment, the trial court ordered that White Lion pay $325,600 in penalties, fees of $129,464.15, and attorney's fees of $40,800.  (CR at 563.)   In addition, the trial court's judgment simultaneously severed the State's identical claims against White Lion from those which remained pending against Morello.  (CR at 568.)   The result was a final judgment against White Lion bearing cause number D-1-GV-13001068 in the amount of $495,864.15.

Thirty-two days after the trial court's plenary power had expired in cause number D-1-GV-13001068, the State filed its motion for final summary judgment as to the exact claims against Morello and set same for hearing on December 16, 2014.  (CR at 569, 599.)   On February 19, 2015, the trial court conducted a hearing on the motion and on March 9, 2015 issued a letter ruling granting same.  (CR at 1400.)  On April 14, 2015, the

trial court entered a Final Summary Judgment against Morello, ordering him to pay penalties of $367,250 and attorney's fees in the amount of $26,844. Thus, the final result was a second judgment against Morello bearing cause number D-1-GV-06000627 in the amount of $394,094. (CR at 1458.)

On May 15, 2015, Morello filed his Motion for New Trial raising several grounds for relief. (CR at 1463.) In one of these grounds, Morello argued that the trial court's severance of the State's claims against White Lion and Morello created two separately-enforceable judgments resulting in an unconstitutional double recovery for the State. On June 2, 2015, the trial court rejected this claim for relief by denying Morello's Motion for New Trial. (CR at 1769.)

**C.** **A Trial Court Abuses Its Discretion By Severing Actions which Are Interwoven with the Remaining Claims Involving the Same Facts and Issues**

Parties and actions may be severed "at any stage of the action, before the time of submission to the jury or to the court if trial is without a jury, on such terms as are just." *State Dept. of Highways and Public Transp. v. Cotner*, 845 S.W.2d 818, 819 (Tex. 1993) (per curiam) (citing TEX. R. CIV. P. 41). "Rule 41 does not 'permit a trial court to sever a case after it has been submitted to the trier of fact.'" *Cotner*, 845 S.W.2d at 819. Where a court servers following submission to a fact finder, the result is an abuse of discretion. *See id*.

Pre-submission severance of claims under the Texas Rules of Civil Procedure rests within the sound discretion of the trial court. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex. 1990). A trial court properly exercises its

discretion in severing claims when: (1) the controversy involves more than one cause of action; (2) the severed claim is one that could be asserted independently in a separate lawsuit; and (3) the severed actions are not so interwoven with the other claims that they involve the same facts and issues. *Id*. at 658. Where a court severs a claim and any of the three elements are not satisfied, the result is an abuse of discretion. *See Jones v. Ray*, 886 S.W.2d 817, 822 (Tex. App.—Houston [1st Dist.] 1994, orig. proceeding).

### D. The State's Claims Against White Lion and Morello Involved the Identical Facts and Issues Making Severance Error

As noted by the Supreme Court in *Guaranty Federal*, the third severance factor requires a showing that the severed claims are not so interwoven with the other claims that they involve the same facts. *See* 793 S.W.2d at 658. Among other reasons, the claims in a case are considered interwoven when their severance would result in two or more separate judgments that, taken in the abstract, would either: (1) undercompensate the plaintiff (because the respective juries could each find the other defendant fully liable and thus each award plaintiff nothing), or (2) over compensate the plaintiff (because the respective juries could each find their respective defendant fully liable and enter two verdicts imposing a double recovery). *Santos v. Holzman*, No. 13-02-662-CV, 2005 WL 167309, at *4 (Tex. App.—Corpus Christi Jan. 27, 2005, pet. denied) (mem. op.). In situations presenting the prospect of double recovery for the plaintiff or double jeopardy for the defendant (such as the present case), severance is improper because the third *Guaranty Federal* factor cannot be met. *See Jones,* 886 S.W.2d at 821-22.

In the present case, the State's suit consisted of two claims. (CR at 38.) The first was that White Lion failed to comply with the remedial provisions of CP-50129. (*Id*.)

31

The State's second claim was that White Lion failed to comply with CP-50129 by not acquiring financial assurance in the amount of $574,000. (*Id*.) As alleged by the State, both violations rendered it in violation of Texas Water Code sections 7.101 and 7.102. (*Id*.) The State asserted the exact claims against Morello in his individual status and sought the damages from both Morello and White Lion. (*Id*.) The Court—in two separately-enforceable judgments (cause numbers D-1-GV-06000627 and D-1-FV-13-001068)—awarded the State the same damages against White Lion and Morello. Thus, and for the same reasons noted by the *Santos* court, severance of the State's claims against White Lion and Morello involved a misapplication of the law and was therefore an abuse of discretion. *See Walker v. Packer*, 827 S.W.2d at 840.

### E. Additionally, the Trial Court's Severance Order Was Also an Abuse of Discretion as It Was Entered Post-Submission

In addition the above, the trial court's severance order was also error because the severance occurred after it had granted summary judgment against White Lion. Rule 41 is clear in that parties and actions may be severed "before the time of submission to the jury ***or to the court if trial is without a jury***, on such terms as are just." *Cotner*, 845 S.W.2d at 819 (emphasis added). Where a court servers following submission to a fact finder, the result is an abuse of discretion. *Id*.

In the present case, the trial court rendered interlocutory summary judgment against White Lion on September 19, 2013 (CR at 563). In that judgment, the trial court ordered that White Lion pay $325,600 in penalties, fees of $129,464.15, and attorney's fees of $40,800. (CR at 563.) The trial court simultaneously converted the judgement into a final one by severing the State's identical claims against White Lion from those

which remained pending against Morello. (CR at 568.) As a result, the severance occurred after the time of submission to the court of the summary judgment motion against White Lion. Accordingly, the trial court's severance order was an abuse of discretion for this additional reason.

**F. The Trial Court's Severance Error Was Harmful as It Resulted in an Impermissible Double Recovery for the State as Well as an Excessive Fine in Violation of the Texas and United States Constitutions**

Under Texas Rule of Appellate Procedure 44.1, trial court error only requires reversal if it probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting his case to the court of appeals. *See* TEX. R. APP. P. 44.1. Based on this Court's opinion in *Dalisa, Inc. v. Bradford*, it appears that when a trial court abuses its discretion by improperly severing claims in a case, the error is presumed harmful. *See* 81 S.W.3d 876, 882 (Tex. App.—Austin 2002, no pet.) ("[T]he invalid severance is prejudicial because it converted into a final judgment a judgment that is interlocutory."). Accordingly, it appears that the trial court's erroneous severance is presumed harmful.

In an abundance of caution, however, Morello would show that the severance error was harmful for multiple reasons. The first is that the erroneous order resulted in the rendition of an improper judgment granting the State a double recovery. "Texas law does not permit double recovery." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 441 (Tex. 1995). "A double recovery exists when a plaintiff is awarded more than one recovery for the same injury." *Marin Real Estate Partners, L.P. v. Vogt*, 373 S.W.3d 57, 76 (Tex. App.—San Antonio 2011, pet. filed). In the present case, the severance created two final,

33

enforceable judgments in favor of the State for damages based on the identical theories of liability, facts, and injury. (CR at 563, 1458.) Accordingly, the trial court's erroneous severance order was harmful as it caused rendition of an improper judgment.

Additionally, the erroneous severance order was harmful because it resulted in an unconstitutionally excessive fine against Morello. Article I, section 13 of the Texas Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted." TEX. CONST. ART. I, § 13. The term "fines" has been defined as including civil penalties. *See Pennington v. Singleton,* 606 S.W.2d 682, 690 (Tex. 1980). Generally, prescribing fines is a matter within the discretion of the legislature. A fine is not unconstitutionally excessive, and courts may not override the legislature's discretion, "except in extraordinary cases, where it becomes so manifestly violative of the constitutional inhibition as to shock the sense of mankind." *Id.* (quoting *State v. Laredo Ice Co.,* 96 Tex. 461, 73 S.W. 951, 953 (1903)).

Here, the State used the trial court's severance of its claim against Morello's company, White Lion Holding's LLC, as a mechanism to impose double liability for the same conduct on both Morello and White Lion. After the trial court granted summary judgment against White Lion, it erroneously severed White Lion from the case. The State then sought a second summary judgment against Morello in his individual capacity for the identical conduct, thus accomplishing a double recovery for a single act resulting in a single injury through improper severance. The State even conceded in oral argument before the Court that Morello "is White Lion." (Tab 6 at 24.)

Assuming without conceding that any penalty is justified in this case, the State

34

should have been limited to one penalty against the responsible party, whether it was White Lion or Morello. By severing White Lion, the State avoided a finding on a critical issue central to both motions: who is the responsible party? Even if the State could have pierced the veil of White Lion (which it did not even attempt), at most it would have been entitled to joint and several liability against Morello and White Lion and not a double recovery. S. *Union Co. v. City of Edinburg*, 129 S.W.3d 74, 87 (Tex. 2003) ("We need not decide today whether a theory of 'single business enterprise' is a necessary addition to the theory of alter ego for ***disregarding corporate structure . . . for imposing joint and several liability***.") (emphasis added.) Accordingly, the erroneous severance order resulted in both double recovery for the State and an unconstitutionally excessive fine against Morello and thus rendition of an improper judgment.

**G.     The Trial Court's Severance Error Was Harmful as It Violates The Equal Protection, And Due Course Of Law Provisions Of The Texas Constitution, And The Due Process And Equal Protection Provisions Of The U.S. Constitution**

Independent of the above, the erroneous severance order was also harmful because it resulted in violation of Morello's state and federal constitutional right to equal protection and due course of law. In its two judgments, the Court has now awarded over $889,958 in fines against Morello and White Lion. (CR at 568, 1458.) Yet Morello and White Lion have both consistently maintained an inability to pay the fine and to conduct the remediation the state is demanding. (CR at 1481.) Furthermore, by denying the continuance requested by Morello and White Lion, the Court awarded a penalty that new evidence (discussed *supra*) proves to be unjustified.

Where the amount of a penalty imposed by a State agency is so high that it

effectively deprives a citizen of the ability to litigate his defense to such penalty, it is unconstitutional. *See R. Comm. Inc. v. Sharp*, 875 S.W.2d 314, (Tex. 1994) (holding that conditioning a taxpayer's right to initiate judicial review on the payment of taxes or the posting of a bond equal to twice the alleged tax obligation violates the open courts mandate of the Texas Bill of Rights. TEX. CONST. art. I, § 13.). While this case does not present an open courts question, it does present an unconstitutional denial of due process and equal protection under state and federal law. For this additional reason, the erroneous severance order resulted in imposition of a fine that effectively prevented Morello from litigating a defense to same and thus rendition of an improper judgment.

## ISSUE THREE

**III. The Court's Denial of Morello's Motion for New Trial Based on Newly-Discovered Evidence Was Error**

 **A. The Grant of a New Trial Based on Newly-Discovered Evidence Is Subject to the Discretion of the Trial Court**

A party seeking a new trial on grounds of newly-discovered evidence must demonstrate to the trial court that (1) the evidence has come to its knowledge since the trial, (2) its failure to discover the evidence sooner was not due to lack of diligence, (3) the evidence is not cumulative, and (4) the evidence is so material it would probably produce a different result if a new trial were granted. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). Denial of a motion for new trial based on newly-discovered evidence is reviewed for abuse of discretion. *Jackson v. Van Winkle*, 660 S.W.2d 807, 809–10 (Tex. 1983).

 **B. Morello's Newly-Discovered Evidence Established that CP-50129 and Its Remediation Obligations Were Based on Appellee's Erroneous**

**Determination of the Affected Aquifer**

Prior to White Lion's ownership of the Property, Vision utilized the premises as a steel-tube manufacturing facility. (CR at 1482.) This usage ultimately caused groundwater contamination at the premises due to elevated levels of heavy metals and other compounds. (*Id.*) Vision subsequently discovered the contamination and reported same to the State which then instituted CP-50129 to remediate same. (*Id.*) CP-50129 called for Vision to implement an extensive cleanup and monitoring system consisting of: (1) placing additives in the Property's wastewater impoundments; (2) capping such impoundments with four feet of clay and vegetative covering; (3) implementation and maintenance of a groundwater monitoring program and system to test the effectiveness of CP-50129, (4) installation of a network of wells (21 total) to monitor groundwater flow and contaminants; (5) installation of a network of recovery wells for extraction of contaminated groundwater; (6) submission of semi-annual and annual compliance reports to the State, and other requirements. (*Id.*)

In short, CP-50129 created massive financial and regulatory obligations for Vision and subsequently, White Lion. These onerous remediation and monitoring requirements of CP-50129 were all premised on the State's error that the contaminated ground water plume beneath the Property potentially fed into the Upper Chicot aquifer—which is used for agricultural or human use. (CR at 1483.)

In December 2014, White Lion retained David Heslep and his firm of WDIA Environmental Solutions, LLC, to assess the Property and prepare a proposal for modification of and compliance with CP-50129. (*Id.*) Heslep is a licensed professional

geologist for the State of Texas with significant project management experience and technical expertise in environmental matters. (*Id*.) In particular, Heslep has been involved with numerous groundwater remediation projects at sites in at least 8 states. (*Id*.) In his efforts to bring the Property into compliance with CP-50129, Heslep discovered that the aquifer beneath the Property is actually the Brazos River Alluvial Aquifer—a fact which greatly reduces any risk from the plume beneath White Lion's property. (*Id*.)

As noted by Heslep, had TCEQ's experts properly identified the aquifer at the time CP-50129 was renewed in 1999, "the current pump and treat system required by the Compliance Plan would not have been necessary and that a natural attenuation system would have been appropriate for remediating the contamination at the [Property]." (*Id*.) In short, the entire basis of the Compliance Plan, and the corresponding obligations, were "not necessary to protect the public health and environment." *Id*. Indeed, Mr. Heslep made clear that ***"[h]ad this error not been perpetuated by the State, a less stringent, less expensive plume monitoring system would have been appropriate*."** (*Id*.)

This evidence came to light after trial. (CR at 1748.) Where a trial occurs by summary judgment, courts hold that the evidence must not have been discovered prior to the ruling on summary judgment. *See Indus. Clearinghouse, Inc. v. Jackson Walker, L.L.P.*, 162 S.W.3d 384, 389 (Tex. App.—Dallas 2005, pet denied.). The Court issued its letter ruling on April 6, 2015. (CR at 1457.) As noted supra, Morello discovered the evidence on April 11, 2015. (CR at 1748.) Accordingly, Morello established the first requirement for a new trial based on newly-discovered evidence.

**C.      Morello's Failure to Discover the New Evidence Was Not Due to Lack of Diligence on His Part**

The second element that must be satisfied for a new trial based on newly discovered evidence is that the party's failure to discover the evidence sooner was not due to lack of diligence. *Waffle House*, 313 S.W.3d at 813. Evidence of a party's due diligence in procuring new evidence is properly adduced by affidavit or testimony. *See Edwards v. Edwards*, 418 S.W.3d 757, 761 (Tex. App.—El Paso 2013, no pet.) ("The trial court is not privy to a plaintiff's efforts at due diligence, and as such, it must be apprised of such by sworn affidavit or testimony . . . ."). Finally, whether a party acts with sufficient diligence in discovering the evidence in question is a matter left to the discretion of the court. *See Benz Group v. Barreto*, 404 S.W.3d 92, 97 (Tex. App.–Houston [1st Dist.] 2013, no pet.); *Allseas USA, Inc. v. PS Fabricators, L.L.C.*, 2012 WL 7849219. *9 (Tex. App.—Corpus Christi 2012, no pet.) ("Whether Allseas acted with sufficient diligence was a factual matter best left to the trial court's discretion."). Finally, and as noted by the Texas Supreme Court, diligence is defined as "such diligence that an ordinarily prudent and diligent person would exercise under similar circumstances." *Strickland v. Lake*, 163 Tex. 445, 357 S.W.2d 383, 384 (1962).

Applying this definition of diligence, Morello easily satisfied the second prong of the inquiry. The evidence in question involves the underground aquifer potentially affected by the plume under White Lion's Property, which was misidentified by at least two sets of experts in this case. Specifically, the State's and Vision's environmental experts mistakenly identified the aquifer in 1988, and again in 1998-99, as the Upper Chicot. (CR at 1678-80.) In his affidavit, Heslep mentions that he only discovered the

correct aquifer at issue after long inquiry into hydrological surveys, which provided the key. (*Id.*)

Given that trained geologists misidentified the aquifer at issue, this evidence was not discoverable by a layperson such as Morello. As established by his sworn deposition testimony, Morello repeatedly testified that he: (1) does not hold himself out as an environmental law expert (CR at 1485, 1515); (2) knows nothing about wastewater, groundwater, or groundwater recovery systems (CR at 1567, 1569); (3) considers groundwater related issues to be "way over [his] head" (CR at 1569); and (4) considers issues related to CP 50129 as "not my area of expertise" (CR at 1581-82). In his affidavit, Morello goes further, stating that "I have no education or practical experience with environmental compliance issues, and I had no reason to question any of the underlying geological or hydrological bases for the compliance plan." (CR at 1747.) Taken together, and considering the *Strickland* court's definition of diligence, Morello cannot be found to have lacked reasonable diligence in procuring the newly-discovered evidence. In fact, it would be unreasonable to find or expect Morello to have discovered the evidence sooner than he did. Accordingly, Morello satisfied the second requirement for a new trial based on newly-discovered evidence.

**D.  Morello Established that the Newly-Discovered Evidence Was Not Cumulative**

The third element that must be satisfied for a new trial based on newly discovered evidence is that such evidence is not cumulative of any other evidence in the case. *Waffle House*, 313 S.W.3d at 813. The test for determining whether evidence is cumulative asks "not merely whether the evidence to be adduced from the two witnesses is similar, but

also whether the excluded testimony would have added substantial weight to the offering parties' case." *Sims v. Brackett*, 885 S.W.2d 450, 454 (Tex. App.—Corpus Christi, 1994, no writ). In the present case, there can be no argument that both (1) the newly-discovered evidence was not cumulative as it was contrary to the State's evidence/theory relating to the affected aquifer and (2) such evidence adds substantial weight to Morello's case (as discussed more in the next factor). Indeed, the issue of the plume potentially affecting the Brazos River Alluvium Aquifer appears nowhere in the record in this case. Accordingly, Morello satisfied the third requirement for a new trial based on newly-discovered evidence.

### E. Morello's Newly-Discovered Evidence Would Have Eliminated the Need for the Trial Below

The final element for a new trial based on newly discovered evidence is that the evidence is so material it would probably produce a different result if a new trial were granted. *Waffle House*, 313 S.W.3d at 813. Based on testimony from the Heslep affidavit, this test is met. On this point, Heslep states as follows:

> In essence, the Upper Chicot was erroneously identified as far back as 1988 as a potentially affected aquifer despite the fact that the Upper Chicot generally flows south/southeast, while the flow of the aquifer under the Vision Metals/White Lion facility is to the north. This error was carried forward thereafter in all reports and proposed plans and adopted by the TCEQ and its predecessor. ***The State failed to detect the error, and required the more stringent pump and treat system based on the error. Had this error been detected by the State, a less stringent, less expensive monitored natural attenuation plan would have been appropriate. A monitored natural attenuation plan would have been much cheaper to install, maintain, and operate than the existing system.***
>
> It is my opinion that a monitored natural attenuation plan would have been found appropriate for the site from the start of White Lion's ownership of the site, had the correct aquifer been identified by the State.

41

(CR at 1486, 1680, emphasis added.)

In summary, and had the State correctly determined that the aquifer below the Property was the Brazos River Alluvium Aquifer, CP-50129 would have had vastly different and less expensive remedial and monitoring provisions. In his affidavit, Morello stated that White Lion's failure to comply with CP-50129's remediation and monitoring requirements was due to financial inability. (CR at 1487, 1747). Morello also states that Heslep had previously estimated the costs of a monitored natural attenuation plan (as would have been proper had Appellee identified the proper aquifer at issue), and that White Lion could have financially borne such a burden. (*Id.*) In short, there would have been a completely different result in this case and likely no case at all.

Accordingly, Morello satisfied each of the elements required for a new trial based on newly-discovered evidence. When trial court denied Morello's motion, it clearly failed to analyze or apply the law correctly. Under Texas Supreme Court precedent, this failure constitutes an abuse of discretion. *Walker v. Packer*, 827 S.W.2d at 840 ("[A] clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion"). Accordingly, Morello is entitled to a reversal of the trial court's judgment and remand for a new trial.

## PRAYER

Based on the above, Morello asks this Court to reverse the trial court's final summary judgment order in this case and either render a take-nothing judgment against the State or, alternatively, remand the case for a new trial. Morello also asks this Court for any additional relief to which he may be entitled.

42

Respectfully submitted,

JURANEK LAW FIRM, PLLC

_____
**By: JAMES JURANEK**
State Bar No. 24026888
111 N. Ennis
Houston, Texas 77003
(713) 229-0699
(888) 626-6596 (fax)
james@jjfirm.com


LAPEZE & JOHNS, P.L.L.C.

By:_____
Keith W. Lapeze
Texas Bar No.  24010176
Taylor L. Shipman
Texas Bar No. 24079323
601 Sawyer Street, Suite 650
Houston, Texas 77007
Tel.  (713) 739-1010
Fax.  (713) 739-1015
keith@lapezejohns.com
taylor@lapezejohns.com


## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief of Appellant, filed on October 7, 2015, was prepared with Microsoft Word for Windows and that, according to that program's word-count function, the sections covered by Texas Rule of Appellate Procedure 9.4(i)(1) contain 11,738 words.

_____
James Juranek

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was forwarded to Appellant's Counsel by *the electronic filing manager,* pursuant to the Texas Rule of Appellate Procedure 9.5(b)(1), on this 7th day of October 2015.

***VIA Facsimile***
David Priester
Ryan P. Fite
Craig Pritzlaff
Assistant Attorney General
P.O. Box 12548, MC-066,
Austin, TX 78711

_____
James Juranek

# Appendix

**Tab 1:**      Final Judgment and Severance Order in Cause No. D-1-GV-06-000627

**Tab 2:**      Final Judgment and Severance Order in Cause No. D-1-GV-06-000627

**Tab 3:**      Act of May 25, 1991, 72d Leg., R.S., ch. 901, § 42, art. 4.03, 1991 Tex. Gen. Laws 3203 (amended 2003) (current version at TEX. BUS. ORG. CODE ANN. §101.114 (West Pamph. 2011)

**Tab 4:**      Act of June 16, 1987, 70th Leg., 1 C.S., Ch. 2, 1987 Tex. Gen. Laws 42-43 (amended 1995)

**Tab 5:**      Act of May 18, 1995, 74th Leg., R.S., Ch. 136, 1995 Tex. Gen. Laws 974 (repealed 2001)

**Tab 6:**      Transcript of Summary Judgment Hearing

# TAB 1

Filed in The District Court
of Travis County, Texas

LM SEP 1 9 2013

At_____ 10:05 ∧ M.
Amalia Rodriguez-Mendoza, Clerk

No. D-1-GV-06-000627

| | | |
|---|---|---|
| STATE OF TEXAS,<br>Plaintiff, | § <br> § <br> § <br> § | IN THE DISTRICT COURT OF |
| v. | § <br> § | TRAVIS COUNTY, TEXAS |
| WHITE LION HOLDINGS, L.L.C.,<br>and BERNARD MORELLO<br>Defendants. | § <br> § <br> § | 353rd JUDICIAL DISTRICT |

## FINAL SUMMARY JUDGMENT, PERMANENT INJUNCTION, AND ORDER OF SEVERANCE

The Court having considered the State's Motion for Summary Judgment and Motion for Severance, the Defendant's reply thereto, the argument of counsel, the evidence on file, and the pleadings, the Court GRANTS the Motion.

The Court hereby RENDERS FINAL JUDGMENT for the State of Texas. Therefore, the Court ORDERS:

### I.     PAYMENT OF CIVIL PENALTIES

The State of Texas shall recover civil penalties from White Lion Holdings, L.L.C. in the amount of $325,600.00

### II.     PAYMENT OF UNPAID HAZARDOUS WASTE FACILITY FEES

The State of Texas shall recover from White Lion Holdings, L.L.C. outstanding hazardous waste facility fees outstanding to the Texas Commission on Environmental Quality in the amount of $129,464.15, together with an award of pre-judgment interest.

### III.     PAYMENT OF ATTORNEY'S FEES AND COSTS

The State of Texas shall recover attorney's fees from White Lion Holdings, L.L.C. in the amount of $40,800.00.

The State of Texas shall recover its costs of court from White Lion Holdings, L.L.C.

## IV.    POST-JUDGMENT INTEREST

The State of Texas shall recover pre-judgment interest on all amounts awarded in this judgment at the annual rate of 5.00%.

## V.    PERMANENT INJUNCTION

The State of Texas' request for permanent injunctive relief is granted. Defendant, White Lion Holdings, L.L.C., and its officers, directors, managers, principals, partners, owners, employees, agents, servants, and all persons in active concert or participation with them, on their behalf, or under their control, whether directly or indirectly who receive notice of this Injunction are permanently enjoined as follows:

### A. Words and Terms for this Injunction

As used in this injunction, the words and terms set forth below shall have the following meanings:

1. "White Lion" shall mean White Lion Holdings, L.L.C.
2. "Effective Date" shall mean the date the Court grants summary judgment.
3. "Property" shall mean the (1) land, buildings and substation located at Spur 529 and Scott Road and consisting of 38.5 +/- acres which includes 1.522 +/- acres that comprises the substation; (2) farmland consisting of 133.69 +/- acres; and (3) vacant property consisting of 25.32 +/- acres, also described as located at or about 2010 Spur 529 at Scott Road in Rosenberg, Fort Bend County, Texas; owned by White Lion.
4. "TCEQ" shall mean the Texas Commission on Environmental Quality.
5. "Compliance Plan" shall mean Compliance Plan No. 50129, transferred to White Lion on July 23, 2004.
6. "Groundwater Protection Standard" shall be the concentration specified in Table I, Column B of the Compliance Plan (cadmium, 0.10 mg/L; cobalt, 2.2 mg/L; lead, 0.05 mg/L; barium, 2.0 mg/L; chromium, 0.10 mg/L; nickel, 0.73 mg/L; silver, 0.18 mg/L; zinc, 11.0 mg/L).
7. "Corrective Action System" shall have the meaning set forth in Section II of the Compliance Plan.

**FINAL SUMMARY JUDGMENT AND ORDER OF SEVERANCE**                    **PAGE 2**

## B. Ordering Provisions of this Injunction

1. Subject to the provisions of this Injunction, immediately after the Effective Date, White Lion shall comply with each limitation, requirement, and condition of the Compliance Plan.

2. Within 10 days after the Effective Date, White Lion must provide financial assurance for the Property in accordance with Section XI. of the Compliance Plan in a form acceptable to the TCEQ and in an amount not less than $574,000, and must submit to TCEQ an originally signed version of the financial assurance mechanism obtained.

3. Within 15 days after the Effective Date, White Lion must inspect and evaluate each monitoring well, point of compliance well, corrective action system recovery wells, and corrective action observation wells that are part of the Corrective Action Program and Ground Water Monitoring Program set forth in the Compliance Plan, including, but not limited to, the following wells identified in Table II of the Compliance Plan:

   a. Monitoring Wells (MW): MW-1; MW-2; MW-3; MW-4; MW-5; MW-6; MW-7; MW-8; MW-9; MW-10; MW-11; MW-12; MW-13; MW-14; MW-15; MW-16; MW-17; MW-18A; MW-18B; MW-18C; MW-19A; MW-19B; MW-19C; MW-20A; MW-20B; MW-20C; MW-21A; MW-21B; MW-21C.

   b. Recovery Wells (RW): RW-22; RW-23; RW-24; RW-25; RW-26.

   c. Piezometer Well (P): P-1; P-2; P-3.

   White Lion must notify the TCEQ in writing immediately upon completion of the requirements stated in this paragraph.

4. Within 20 days after the Effective Date, if the conditions of any of the wells identified in Paragraph B.3. of this Injunction "no longer enable the well to yield samples representative of groundwater quality" (*see* Compliance Plan at Section III.D.3), White Lion must submit to the TCEQ a proposal for replacement of such well(s). Any new well must be designed and constructed in accordance with Attachment B, Well Design and Construction Specifications, of the Compliance Plan. Any well that is to be abandoned or plugged, shall be abandoned and plugged in accordance with Paragraph 14 of Attachment B of the Compliance Plan.

5. Within 60 days after the Effective Date, White Lion must repair, redevelop, replace, or take other necessary action to fully restore to full operating condition each of the wells identified in Paragraph B.3. of this Injunction. White Lion must notify the TCEQ in writing immediately upon completion of the requirements stated in this paragraph.

**FINAL SUMMARY JUDGMENT AND ORDER OF SEVERANCE**      **PAGE 3**

6. Within 75 days after the Effective Date, as set forth in Section VI.C of the Compliance Plan, White Lion must obtain a groundwater sample from each of the wells identified in Paragraph B.3. of this Injunction and shall have each collected groundwater sample individually analyzed for the constituents listed in Table I, Columns A and C of the Compliance Plan (including cadmium, cobalt, lead, barium, chromium, nickel, silver, zinc, pH, conductivity, total dissolved solids, iron, and sulfate). White Lion shall have each of the collected groundwater samples analyzed in accordance with the current edition of U.S. EPA Publication SW-846, Test Methods for Evaluating Solid Waste and American Society for Testing and Materials (ASTM) Standard Test Methods or any other methods accepted by the TCEQ, and the groundwater analysis shall be conducted at a facility capable of measuring the concentration of each constituent at a concentration equal to or less than the corresponding Groundwater Protection Standard. *See* Compliance Plan Section VI.B. In each background well, point of compliance well, and corrective action system well, White Lion shall also measure and record water level measurements relative to mean sea level measured to within 0.01 feet, the total depth of each well, and descriptions of the appearance of the groundwater collected (clarity, color, odor). *See* Compliance Plan Section VI.C.4. White Lion must notify the TCEQ in writing immediately upon completion of the requirements stated in this paragraph.

7. Within 90 days after the Effective Date, White Lion shall submit to the TCEQ a proposal for activation of the Recovery Wells and Corrective Action System at the Property. In accordance with Section III.B. of the Compliance Plan, such proposal must include a proposed method for management of groundwater recovered from each Recovery Well (including any purge water from any other well).

8. Within 90 days of the Effective Date, White Lion shall submit to the TCEQ a report in accordance with Section VII.B of the Compliance Plan, including the following information:

   a. A narrative summary of the evaluations made following restoration of the wells as set forth in Paragraph B.3. of this Injunction and the sampling/analysis conducted as set forth in Paragraph B.6. of this Injunction;

   b. Water table maps prepared from the ground-water data collected as per Paragraph B.6. of this Injunction, and shall include directions of ground-water flow and estimation of the rate and direction of groundwater contamination migration;

   c. An updated table and map of all monitoring and corrective action system wells, including all records, well logs, borings, and related documents for each monitoring well, point of compliance well, corrective action system recovery wells, and corrective action observation wells that are part of the Corrective Action Program and Ground Water Monitoring Program;

**FINAL SUMMARY JUDGMENT AND ORDER OF SEVERANCE**          **PAGE 4**

d. Results of the chemical analysis, submitted in a tabular format acceptable to the TCEQ, which clearly indicates each parameter that exceeds the Groundwater Protection Standard, including copies of the original laboratory report for chemical analyses showing detection limits and quality control and quality assurance data;

e. Tabulation of all water level elevations, depth to water measurements, and total depth of well measurements collected;

f. Potentiometric surface maps showing the elevation of the water table at the time of sampling conducted as per Paragraph B.6. of this Injunction, delineation of the radius of influence of the Corrective Action System, and the direction of groundwater flow gradients outside any radius of influence;

g. Tabulation of all data evaluations conducted pursuant to Section VI.D. of the Compliance Plan and the status of each well with regard to compliance with the Corrective Action objectives and compliance with the Groundwater Protection Standards;

h. Maps of the contaminated area depicting concentrations of constituents exceeding the Groundwater Protection Standards as isopleth contours or discrete concentrations if isopleth contours cannot be inferred;

i. An updated schedule summary of all activities required by the Compliance Plan as required by Section X of the Compliance Plan;

j. Summary of any changes made to the monitoring/corrective action program and a summary of activities conducted as set forth in Paragraphs B.1. to B.6. of this Injunction, including all documents obtained from performance of those activities;

k. Tabulation of well casing elevations in accordance with Attachment B of the Compliance Plan; and

l. A corrective measures implementation report as set forth in Section VIII.F. of the Compliance Plan, if determined to be necessary.

9. White Lion shall address each report, proposal, or notice required to be submitted by the Injunction to:

Order Compliance Team
Texas Commission on Environmental Quality
MC-224
P.O. Box 13087
Austin, Texas 78711-3087

**With copies to:**

Craig J. Pritzlaff
Case, AG#052198322
Office of the Attorney General
Environmental Protection Division
(MC-066)
P.O. Box 12548
Austin, Texas 78711-2548

**FINAL SUMMARY JUDGMENT AND ORDER OF SEVERANCE**                    **PAGE 5**

## VI.    ORDER OF SEVERANCE

The Clerk will file a copy of this Final Summary Judgment and Permanent Injunction and Order of Severance under a separate docket number, to wit, **D-1-GV-13 001068**

THE COURT FURTHER ORDERS that the Clerk of this Court shall issue a writ of permanent injunction against White Lion as set forth in Section V. of this ORDER AND FINAL JUDGMENT.

THE COURT FURTHER ORDERS that execution to issue for this FINAL JUDGMENT.

THE COURT FURTHER ORDERS that the State shall be allowed such writs and processes as may be necessary to enforce this FINAL JUDGMENT.

This FINAL JUDGMENT finally disposes of all parties and all claims, and is appealable. All relief not expressly granted is denied.

SIGNED this ___19TH___ day of ___SEPTEMBER___ 2013.

_____

JUDGE PRESIDING

TIM SUGAR

**FINAL SUMMARY JUDGMENT AND ORDER OF SEVERANCE**        **PAGE 6**

# TAB 2

Filed in The District Court
of Travis County, Texas

APR 1 4 2015

At_____5 ρм_____M.
Velva L. Price, District Clerk

No. D-1-GV-06-000627

| | | |
|---|---|---|
| **STATE OF TEXAS,** | § | **IN THE DISTRICT COURT OF** |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **TRAVIS COUNTY, TEXAS** |
| | § | |
| **BERNARD MORELLO,** | § | |
| **Defendant.** | § | **353rd JUDICIAL DISTRICT** |

## FINAL SUMMARY JUDGMENT

The Court having considered the State's Motion for Summary Judgment, the Defendant's response thereto, the State's reply, the argument of counsel, the evidence on file, and the pleadings, the Court GRANTS the Motion.

The Court RENDERED FINAL JUDGMENT for the State of Texas in a letter dated March 9, 2015, and after reconsidering, confirmed its judgment in a separate letter dated April 6, 2015. This written judgment memorializes that rendition.

Accordingly, the Court ORDERS:

### I. PAYMENT OF CIVIL PENALTIES

The State of Texas shall have judgment against and shall recover civil penalties from Bernard Morello in the amount of $367,250.00.

### II. PAYMENT OF ATTORNEY'S FEES AND COSTS

The State of Texas shall have judgment against and shall recover attorney's fees from Bernard Morello in the amount of $26,844.00.

The State of Texas shall have judgment against and shall recover its costs of court from Bernard Morello.

Case # D-1-GV-06-000627

003980381



1458

## III.    POST-JUDGMENT INTEREST

The State of Texas shall have judgment against and shall recover post-judgment interest from Bernard Morello on all amounts awarded in this judgment at the rate of 5.00% compounded annually, from the date this judgment is entered until all amounts are paid in full.

After reconsidering the State's objections to summary-judgment evidence, the Court also orders that the State's objections to the admission of the Affidavits of David H. Heslep and Wayne Crouch, included with Bernard Morello's Response to the State's Motion for Summary Judgment at Exhibit H and Exhibit I, are OVERRULED.

THE COURT FURTHER ORDERS that execution to issue for this FINAL JUDGMENT.

THE COURT FURTHER ORDERS that the State of Texas shall be allowed such writs and processes as may be necessary to enforce this FINAL JUDGMENT.

This FINAL JUDGMENT finally disposes of all parties and all claims, and is appealable. All relief not expressly granted is denied.

SIGNED on _April 14_____, 2015

_____
HON. RHONDA HURLEY
JUDGE PRESIDING

**FINAL SUMMARY JUDGMENT**
**D-1-GV-06-000627**                                                    **PAGE 2**

**APPROVED AS TO FORM:**

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

JON NIERMANN
Chief, Environmental Protection Division


Craig J. Pritzlaff
Assistant Attorney General
Environmental Protection Division
P.O. Box 12548, MC 066
Austin, Texas 78711-2548
Craig.Pritzlaff@texasattorneygeneral.gov

*Attorneys for Plaintiff State of Texas*

**FINAL SUMMARY JUDGMENT**
**D-1-GV-06-000627**                                             **PAGE 3**

1460

## APPROVED AS TO FORM:

Stephen A. Doggett
Attorney at Law
201 South 11th Street
Richmond, Texas 77469
office@doggett-law.com

*Attorney for Defendant Bernard Morello*

**FINAL SUMMARY JUDGMENT**
**D-1-GV-06-000627**

**PAGE 4**

**APPROVED AS TO FORM:**

Keith W. Lapeze
Taylor L. Shipman
Lapeze & Johns, PLLC
601 Sawyer Street, Suite 650
Houston, Texas 77077
Keith@lapezejohns.com

*Attorneys for Defendant Bernard Morello*

**FINAL SUMMARY JUDGMENT**
**D-1-GV-06-000627**

**PAGE 5**

1462

# TAB 3

Vernon's Ann.Texas Civ.St. Art. 1528n
VERNON'S TEXAS STATUTES AND CODES ANNOTATED
CIVIL STATUTES
**TITLE 32—CORPORATIONS**
**CHAPTER EIGHTEEN—MISCELLANEOUS**

Art. 1528n. Texas ==Limited Liability Company== Act

PART ONE

Short title, captions, parts, articles, sections, subsections, and paragraphs

Art. 1.01. A. This act shall be known and may be cited as the "Texas Limited Liability Company Act."

B. The divisions of this act into Parts, Articles, Sections, Subsections and Paragraphs and the use of captions in connection therewith are solely for the convenience and shall have no legal effect in construing the provisions of this Act.

C. This act has been organized and subdivided in the following manner:

(1) The act is divided into Parts, containing groups of related Articles. Parts are numbered consecutively with cardinal numbers.

(2) The act is also divided into Articles, numbered consecutively with Arabic numerals.

(3) Articles are divided into Sections. The Sections within each Article are numbered consecutively with capital letters.

(4) Sections are divided into subsections. The subsections within each Section are numbered consecutively with Arabic numerals enclosed in parentheses.

(5) Subsections are divided into paragraphs. The paragraphs within each subsection are numbered consecutively with lower case letters enclosed in parentheses.

Definitions

Art. 1.02. A. As used in this Act, unless the context otherwise requires, the term:

(1) "Bankrupt" means bankrupt under the federal Bankruptcy Act or insolvent under any state insolvency act.

(2) "Court" includes every court and judge having jurisdiction in the action.

(3) "Limited Liability Company" or "Company" means a limited liability company organized and existing under this chapter.

(4) "Person" includes an individual, partnership, limited partnership, limited liability company, foreign limited liability company, trust, estate, corporation, custodian, trustee, executor, administrator, nominee or entity in a representative capacity.

(5) "Real Property" means land and any interest or estate in land.

(6) "Business" means every trade and occupation or profession.

(7) "Conveyance" means every assignment, lease, mortgage, or incumbrance.

(8) "TBCA" means the Texas Business Corporation Act as amended and as it may hereafter be amended.

(9) "Foreign Limited Liability Company" means an entity formed under the laws of a jurisdiction other than this state (a) that is characterized as a limited liability company by such laws or (b) although not so characterized by such laws, that elects to procure a certificate of authority pursuant to Article 7.01 of this act, that is formed under laws which provides that some or all of the persons entitled to receive a distribution of the assets thereof upon the entity's dissolution or otherwise or to exercise voting rights with respect to an interest in the entity shall not be liable for the debts, obligations or liabilities of the entity and which is not authorized to qualify to do business in this state under any other statute.

PART TWO

Purposes

Art. 2.01. A. A limited liability company formed under this Act may engage in any lawful business unless a more limited

purpose is stated in its articles of organization or regulations.

B. A limited liability company engaging in a business that is subject to regulation by another Texas statute may be formed under this Act only if it is not prohibited by the other statute. The limited liability company is subject to all limitations of the other statute.

## Powers

Art. 2.02. A. Each limited liability company shall have the power provided for a corporation under the TBCA and a limited partnership under the Texas Revised Limited Partnership Act.

B. Nothing in this Article grants any authority to managers or members of a limited liability company for the exercise of the powers of a limited liability company, inconsistent with limitations on any of the same which may be expressly set forth in this Act or any articles of organization or regulations or in any laws of this State. Authority of managers and members to act beyond the scope of the purpose or purposes of a limited liability company is not granted by any provision of this Act.

C. Nothing contained in this Act shall be deemed to authorize any action in violation of the Anti-Trust laws of this State, as now existing or hereafter amended.

## Limited liability company names; use of assumed names

Art. 2.03. A. The limited liability company name shall conform to the following requirements:

(1) It shall either contain the word "Limited" or the abbreviation "Ltd." or "L.C." and shall contain such additional words as may be required by law.

(2) It shall not contain any word or phrase which indicates or implies that it is organized for any purpose other than one or more of the purposes contained in its articles of organization.

(3) It shall not be the same as, or deceptively similar to, the name of any domestic limited liability company, corporation or limited partnership existing under the laws of this state, or the name of any foreign limited liability company, corporation or limited partnership authorized to transact business in this state, or a name the exclusive right to which is, at the time, reserved in the manner provided in this Act or any other statute providing for reservation of names by a corporation or limited partnership, or the name of a limited liability company, corporation or limited partnership which has in effect a registration of its company name as provided in this act or any other applicable law provided that a name may be similar if written consent is obtained from the existing limited liability company, corporation or limited partnership having the name deemed to be similar or the person for whom the name deemed to be similar is reserved in the office of the Secretary of State.

B. Any domestic or foreign limited liability company having authority to transact business in this State, may do so under an assumed name, by filing an assumed name certificate in the manner prescribed by law.

C. The filing of articles of organization under Part Three of this Act or an application to reserve a specified company name under Article 2.04 of this Act, does not authorize the use of limited liability company name in this State in violation of the rights of another under the Federal Trademark Act of 1946 (15 U.S.C., Section 1051 et seq.), the Texas trademark law (Chapter 16, Business & Commerce Code), the Assumed Business or Professional Name Act (Chapter 36, Business & Commerce Code), or the common law.

## Reserved name

Art. 2.04. A. The exclusive right to the use of a limited liability company name may be reserved by any person.

B. The reservation shall be made by filing with the Secretary of State an application to reserve a specified company name, executed by the applicant or the attorney or agent thereof. If the Secretary of State finds that the name is available for limited liability company use, the Secretary of State shall reserve the same for the exclusive use of the applicant for a period of one hundred and twenty (120) days.

C. The right to the exclusive use of a specified company name so reserved may be transferred to any other person or limited liability company by filing in the office of the Secretary of State a notice of such transfer, executed by the applicant for whom the name was reserved, and specifying the name and address of the transferee.

## Registered office and registered agent

Art. 2.05. A. Each limited liability company or foreign limited liability company subject to this Act shall have and continuously maintain in this State:

(1) A registered office which may be, but need not be, the same as its place of business.

(2) A registered agent, which agent may be either an individual resident in this State whose business office is identical with

such registered office, or a person organized under or authorized to transact business in this State which has a business office identical with such registered office.

Change of registered office or registered agent

Art. 2.06. A. A limited liability company or foreign limited liability company subject to this Act may change its registered office or change its registered agent, or both, upon filing in the office of the Secretary of State a statement setting forth:

(1) The name of the limited liability company.

(2) The post office address of its then registered office.

(3) If the post office address of its registered office is to be changed, the post office address to which the registered office is to be changed.

(4) The name of its then registered agent.

(5) If its registered agent is to be changed, the name of its successor registered agent.

(6) That the post office address of its registered office and the post office address of the business office of its registered agent, as changed, will be identical.

(7) That such change was authorized by its members or managers.

B. The statement required by this article shall be executed on behalf of the limited liability company or foreign limited liability company by an authorized member or manager. The original and a copy of the statement shall be delivered to the Secretary of State. If the Secretary of State finds that such statement conforms to the provisions of this Act, the Secretary of State shall, when the appropriate filing fee is paid as prescribed by law:

(1) Endorse on the original and the copy the word "filed," and the month, day, and year of the filing thereof.

(2) File the original in the office of the Secretary of State.

(3) Return the copy to the limited liability company or its representative.

C. Upon such filing, the change of address of the registered office, or the appointment of a new registered agent, or both, as the case may be, shall become effective.

D. Any registered agent of a limited liability company or foreign limited liability company may resign:

(1) by giving written notice to the limited liability company at its last known address; and

(2) by giving written notice, in duplicate (the original and one copy of the notice), to the Secretary of State within ten days after mailing or delivery of said notice to the limited liability company. Such notice shall include the last known address of the limited liability company and shall include the statement that written notice of resignation has been given to the limited liability company and the date thereof. Upon compliance with the requirements as to written notice, the appointment of such agent shall terminate upon the expiration of thirty (30) days after receipt of such notice by the Secretary of State.

If the Secretary of State finds that such written notice conforms to the provisions of this Act, the Secretary of State shall:

(1) Endorse on the original and the copy of the word "filed" and the month, day, and year of the filing thereof.

(2) File the original in the office of the Secretary of State.

(3) Return the copy to such resigning registered agent.

(4) Notify the limited liability company of the resignation of the registered agent.

No fee shall be required to be paid for the filing of a resignation under this section.

Change of address of registered agent

Art. 2.07. A. The location of the registered office in Texas for a limited liability company or foreign limited liability company subject to this Act may be changed from one address to another upon filing in the office of the Secretary of State a statement setting forth:

(1) The name of the limited liability company or foreign limited liability company represented by such registered agent.

(2) The address at which such registered agent has maintained the registered office for the limited liability company or foreign limited liability company.

(3) The new address at which such registered agent will thereafter maintain the registered office for the limited liability company or foreign limited liability company.

(4) A statement that notice of the change has been given to said limited liability company or foreign limited liability company in writing at least ten (10) days prior to such filing.

B. The statement required by this article shall be signed by the registered agent, or, an authorized officer, manager or member on its behalf. If the registered agent is simultaneously filing statements as to more than one limited liability company, each such statement may contain facsimile signatures in the execution. The original and one copy of the statement shall be delivered to the Secretary of State. If the Secretary of State finds that such statement conforms to the provisions of this Act,

the Secretary of State shall:

(1) Endorse on the original and the copy the word "filed," and the month, day, and year of the filing thereof.

(2) File the original in the office of the Secretary of State.

(3) Return the copy to such registered agent.

C. The registered office of the limited liability company or foreign limited liability company named in such statement shall be changed to the new address of the registered agent upon the filing of such statement by the Secretary of State.

### Service of process on a limited liability company

Art. 2.08. A. The managers and the registered agent shall be agents of a limited liability company or foreign limited liability company upon whom any process, notice, or demand required or permitted by law to be served upon the limited liability company or foreign limited liability company may be served.

B. Whenever a limited liability company or foreign limited liability company shall fail to appoint or maintain a registered agent in this State, or whenever its registered agent cannot with reasonable diligence be found at the registered office, then the Secretary of State shall be an agent of such limited liability company or foreign limited liability company upon whom any such process, notice, or demand may be served. Service on the Secretary of State of any process, notice, or demand shall be made by delivering to and leaving with the Secretary of State, or with the Assistant Secretary of State, or with any clerk having charge of the limited liability company department of the Secretary of State's office, duplicate copies of such process, notice, or demand. In the event any such process, notice, or demand is served on the Secretary of State, the Secretary of State shall immediately cause one of the copies thereof to be forwarded by registered mail, addressed to the limited liability company or foreign limited liability company at its registered office. Any service so had on the Secretary of State shall be returnable in not less than thirty (30) days.

C. The Secretary of State shall keep a record of all processes, notices and demands served under this Article, and shall record therein the time of such service and the action with reference thereto.

D. Nothing herein contained shall limit or affect the right to serve any process, notice, or demand required or permitted by law to be served upon a limited liability company or foreign limited liability company in any manner now or hereafter permitted by law.

### Regulations of limited liability company

Art. 2.09. A. The power to adopt, alter, amend, or repeal the regulations of a limited liability company shall be vested in the members of the company unless vested in whole or part in the manager or managers of the company by the articles of organization or regulations. Regulations adopted by the members or by the managers may be repealed or altered; new regulations may be adopted by the members; and regulations may provide that they may not, in whole or specified part, be altered, amended, or repealed by the managers. The regulations may contain any provisions for the regulation and management of the affairs of the limited liability company not inconsistent with law or the articles of organization. The initial regulations of the limited liability company shall be adopted by the manager or managers named in the articles of organization.

### Contracting debts and obligations

Art. 2.10. A. Except as otherwise provided in this Article or the articles of organization or regulations of the limited liability company, debts, liabilities and other obligations may be contracted for or incurred on behalf of a limited liability company, by:

(1) One or more of its managers, if management of the limited liability company has been vested in a manager or managers; or

(2) Any member or members, if management of the limited liability company is retained by the members.

(3) Any officer or other agent vested with actual or apparent authority.

### Limited liability company property

Art. 2.11. A. Real or personal property owned or purchased by a limited liability company shall be held and owned, and conveyance shall be made, in the name of the limited liability company. Instruments and documents providing for the acquisition, mortgage, or disposition of the property of the limited liability company shall be valid and binding upon the company, if they are executed by one or more persons as provided in the preceding Article.

Managers

Art. 2.12. A. Except and to the extent the regulations shall reserve the same to the members in whole or in part, the powers of a limited liability company shall be exercised by or under the authority of, and the business and affairs of a limited liability company shall be managed under the direction of, the managers of the limited liability company. Managers need not be residents of this State or members of the limited liability company unless the regulations so require. The regulations may prescribe other qualifications for managers.

Number and election of managers

Art. 2.13. A. The managers of a limited liability company shall consist of one or more persons. The number of managers shall be fixed by, or in the manner provided in, the regulations, except as to the number constituting the initial managers, which number shall be fixed by the articles of organization. The number of managers may be increased or decreased from time to time by amendment to, or in the manner provided in, the regulations, but no decrease shall have the effect of shortening the term of any incumbent manager. In the absence of a regulation fixing the number of managers or providing for the manner in which the number of managers shall be fixed, the number of managers shall be the same as the number constituting the initial managers. The names and addresses of the initial managers shall be stated in the articles of organization. Unless removed in accordance with the provisions of the regulations, such persons shall hold office until the first annual meeting of members, and until their successors shall have been elected and qualified. At the first annual meeting of members and at each annual meeting thereafter, the holders of membership interests entitled to vote in the election of managers shall elect managers to hold office until the next succeeding annual meeting, except in case of the classification of managers as permitted by this Act. The regulations may provide that the holders of any class or series of membership interests shall be entitled to elect one or more managers, who shall hold office for such terms as shall be stated in the regulations. Unless removed in accordance with provisions of the regulations, each manager shall hold office for the term for which elected and until a successor shall have been duly elected and qualified. The regulations may provide that at any meeting of members called expressly for that purpose any managers may be removed, with or without cause, as provided therein. Whenever the holders of any class or series of shares are entitled to elect one or more managers by the provisions of the regulations, only the holders of membership interests of that class or series shall be entitled to vote for or against the removal of any managers elected by the holders of that class or series.

Classification of managers

Art. 2.14. A. The regulations may provide that the managers shall be divided into either two or three classes, each class to be as nearly equal in number as possible, the terms of office of managers of the first class to expire at the first annual meeting of members after their election, that of the second class to expire at the second annual meeting after their election, and that of the third class, if any, to expire at the third annual meeting after their election. If the regulations provide for the classification of managers, (1) the whole number of managers of the company need not be elected annually, and (2) at each annual meeting after such classification, the number of managers equal to the number of the class whose term expires at the time of such meeting shall be elected to hold office until the second succeeding annual meeting, if there be two classes, or until the third succeeding annual meeting, if there be three classes.

Vacancies

Art. 2.15. A. Any vacancy occurring in the managers may be filled in accordance with Section B of this Article or may be filled by the affirmative vote of a majority of the remaining managers though less than a quorum of the managers. A manager elected to fill a vacancy shall be elected for the unexpired term of the predecessor in office.
B. Any vacancy occurring in the managers to be filled by reason of an increase in the number of managers may be filled by election at an annual or special meeting of members called for that purpose.
C. Notwithstanding Sections A and B of this Article, whenever the holders of any class or series of membership interests are entitled to elect one or more managers by the provisions of the regulations, any vacancies, and any newly created managers of such class or series to be filled by reason of an increase in the number of such managers may be filled by the affirmative vote of a majority of the managers, elected by such class or series then in office or by a sole remaining manager so elected, or by the vote of the holders of the outstanding membership interests of such class or series, and such vacancy shall not in any case be filled by the vote of the remaining managers or the holders of the outstanding membership interests as a whole unless otherwise provided in the regulations.

Quorum of and action by managers

Art. 2.16. A. A majority of the number of managers fixed by, or in the manner provided in, the regulations shall constitute a quorum for the transaction of business unless a greater number is required by law or the regulations. The act of the majority of the managers present at a meeting at which a quorum is present shall be the act of the managers, unless the act of a greater number is required by law or the regulations.

Interested managers

Art. 2.17. A. No contract or transaction between a limited liability company and one or more of its managers or officers, or between a limited liability company and any other limited liability company, corporation, partnership, association, or other organization in which one or more of its managers or officers are managers, directors or officers or have a financial interest, shall be void or voidable solely for this reason, solely because the manager or officer is present at or participates in the meeting of managers or of a committee of managers which authorizes the contract or transaction, or solely because such manager's or managers' votes are counted for such purpose, if:
(1) The material facts as to the relationship or interest and as to the contract or transaction are disclosed or are known to the managers or the committee, and the managers or committee in good faith authorizes the contract or transaction by the affirmative vote of a majority of the disinterested managers, even though the disinterested managers be less than a quorum; or
(2) The material facts as to the relationship or interest and as to the contract or transaction are disclosed or are known to the members entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the members; or
(3) The contract or transaction is fair as to the limited liability company as of the time it is authorized, approved, or ratified by the managers, a committee thereof, or the members.
B. Common or interested managers may be counted in determining the presence of a quorum at a meeting of the managers or of a committee which authorizes the contract or transaction.

Committees of the managers

Art. 2.18. A. If the regulations so provide, the managers, by resolution, may designate from among the managers one or more committees, each of which shall be comprised of one or more of the managers, and may designate one or more of the managers as alternate members of any committee, who may, subject to any limitations imposed by the managers, replace absent or disqualified managers at any meeting of that committee. Any such committee, to the extent provided in such resolution or in the regulations, shall have and may exercise all of the authority of the managers, subject to the limitations set forth in Sections B and C of this Article.
B. No committee of the managers shall have the authority of the managers in reference to:
(1) amending the regulations, except that a committee may, to the extent provided in the resolution designating that committee or in the articles of organization or the regulations, exercise the authority of the managers provided in the regulations to establish the relative rights and preferences of the membership interests of any class or series;
(2) approving a plan of merger or share exchange of the limited liability company;
(3) recommending to the members a voluntary dissolution of the limited liability company or a revocation thereof;
(4) filling vacancies in the managers;
(5) fixing the compensation of any member or alternate members of such committee; or
(6) altering or repealing any resolution of the managers that by its terms provides that it shall not be so amendable or repealable.
C. The designation of a committee of the managers and the delegation thereto of authority shall not operate to relieve the managers of any responsibility imposed by law.

Place and notice of managers' meetings

Art. 2.19. A. Meetings of the managers, regular or special, may be held either within or without this State.
B. Regular meetings of the managers may be held with or without notice as prescribed in the regulations. Special meetings of the managers shall be held upon such notice as is prescribed in the regulations. Attendance of a manager at a meeting shall constitute a waiver of notice of such meeting, except where a manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the managers need be specified in the notice or waiver

of notice of such meeting, unless required by the regulations.

## Indemnification

Art. 2.20. A. A limited liability company shall have power to indemnify managers, officers, employees, agents and others to the same extent a corporation may indemnify directors, employees, agents and others under the TBCA and shall, to the extent indemnification is required under the TBCA for directors, employees, agents and others, indemnify managers, officers, employees, agents and others to the same extent.

## Powers of managers and officers

Art. 2.21. A. The managers may designate one or more persons as officers of the limited liability company who are not managers. Every manager and officer is an agent of the limited liability company for the purpose of its business and the act of a manager or officer, including the execution in the name of the limited liability company of any instrument for apparently carrying on in the usual way the business of the limited liability company, binds the limited liability company unless the manager or officer so acting otherwise lacks the authority to act for the limited liability company and the person with whom the manager or officer is dealing has knowledge of the fact that the manager or officer has no such authority.

## Records to be kept; access to information

Art. 2.22. A. A domestic limited liability company shall keep and maintain the following records in its principal office in the United States or make them available in that office within five days after the date of receipt of a written request under Section E of this Article:
(1) a current list that states:
(a) the name and mailing address of each member;
(b) the percentage or other interest in the limited liability company owned by each member; and
(c) if one or more classes or groups are established in or under the articles of organization or regulations, the names of the members who are members of each specified class or group;
(2) copies of the federal, state, and local information or income tax returns for each of the limited liability company's six most recent tax years;
(3) a copy of the articles of organization and regulations, all amendments or restatements, executed copies of any powers of attorney, and copies of any document that creates, in the manner provided by the articles of organization or regulations, classes or groups of members;
(4) unless contained in the articles of organization or regulations, a written statement of:
(a) the amount of the cash contribution and a description and statement of the agreed value of any other contribution made by each member, and the amount of the cash contribution and a description and statement of the agreed value of any other contribution that the member has agreed to make in the future as an additional contribution;
(b) the times at which additional contributions are to be made or events requiring additional contributions to be made;
(c) events requiring the limited liability company to be dissolved and its affairs wound up; and
(d) the date on which each member in the limited liability company became a member; and
(5) correct and complete books and records of account of the limited liability company.
B. A limited liability company shall maintain its records in written form or in another form capable of conversion into written form within a reasonable time.
C. A limited liability company shall keep in its registered office in Texas and make available to members on reasonable request the street address of its principal United States office in which the records required by this section are maintained or will be available.
D. A member or an assignee of a membership interest, on written request stating the purpose, may examine and copy, in person or by the member's or assignee's representative, at any reasonable time, for any proper purpose, and at the member's expense, records required to be kept under this section and other information regarding the business, affairs, and financial condition of the limited liability company as is just and reasonable for the person to examine and copy.
E. On the written request by any member or an assignee of a membership interest made to the person and address designated in the regulations, the limited liability company shall provide to the requesting member or assignee without charge true copies of:
(1) the articles of organization and regulations and all amendments or restatements; and
(2) any of the tax returns described in Subdivision (2) of Section A of this Article.

PART THREE

Formation

Art. 3.01. A. Any natural person of the age of eighteen years or more, or any other person (without regard to place of residence, domicile, or organization) may act as an organizer of a limited liability company by signing the articles of organization for such limited liability company and by delivering the original and a copy of the articles of organization to the Secretary of State.

Articles of organization

Art. 3.02. A. The Articles of Organization shall set forth:
(1) The name of the limited liability company;
(2) The period of duration, which may not exceed 30 years from the date of filing with the Secretary of State;
(3) The purpose for which the limited liability company is organized which may be stated to be, or to include, the transaction of any or all lawful business for which limited liability companies may be organized under this Act;
(4) The address of its principal place of business in the state and the name and address of its initial registered agent in the state;
(5) If the limited liability company is to be managed by a manager or managers, a statement that the company is to be managed by a manager or managers and the names and addresses of such managers who are to serve as managers until the first annual meeting of members or until their successors are duly elected. If the management of a limited liability company is reserved to the members, the name and addresses of the members.
(6) Any other provisions, not inconsistent with law, which the members elect to set out in the articles of organization for the regulation of the internal affairs of the limited liability company, including any provisions which under this Act are required or permitted to be set out in the regulations of the limited liability company.
B. It shall not be necessary to set forth in the articles of organization any of the company powers enumerated in this Act.

Filing of articles of organization

Art. 3.03. A. The original and a copy of the articles of organization shall be delivered to the Secretary of State. If the Secretary of State finds that the articles of organization conform to law, the Secretary of State shall, when all fees have been paid as required by law:
(1) Endorse on the original and the copy the word "filed," and the month, day, and year of the filing thereof.
(2) File the original in the office of the Secretary of State.
(3) Issue a certificate of organization to which shall be affixed the copy.
B. The certificate of organization, together with the copy of the articles of organization affixed thereto by the Secretary of State, shall be delivered to the organizers or their representatives.

Effect of the issuance of certificate of organization

Art. 3.04. A. Upon the issuance of the certificate of organization, the limited liability company existence shall begin, and such certificate of organization shall be conclusive evidence that all conditions precedents required to be performed by the organizers have been complied with and that the limited liability company has been organized under this Act, except as against the state in proceedings for involuntary dissolution.

Right to amend articles of organization

Art. 3.05. A. A limited liability company may amend its articles of organization from time to time, in any and as many respects as may be desired, so long as its articles of organization as amended contain only such provisions as might be lawfully contained in original articles of organization at the time of making such amendment.
B. In particular, and without limitation upon such general power of amendment, a limited liability company may amend its articles of organization from time to time so as:
(1) To change its limited liability company name.
(2) To change the time stated in the articles of organization for the dissolution of the limited liability company.
(3) To change, enlarge, or diminish its limited liability company purposes.

(4) To include or modify any provision which could be included in the original articles of organization.

### Articles of amendment

Art. 3.06. A. The articles of amendment shall be executed on behalf of the limited liability company by an authorized manager or member.

B. The articles of amendment shall set forth:

(1) The name of the limited liability company.

(2) If the amendment alters any provision of the original or amended articles of organization an identification by reference or description of the altered provision and a statement of its text as it is amended to read. If the amendment is an addition to the original or amended articles of organization a statement of that fact and the text of each provision added.

### Filing of articles of amendment

Art. 3.07. A. The original and a copy of the articles of amendment shall be delivered to the Secretary of State. If the Secretary of State finds that the articles of amendment conform to law, the Secretary of State shall, when the appropriate filing fee is paid as required by law:

(1) Endorse on the original and the copy the word "filed," and the month, day, and year of the filing thereof.

(2) File the original in the office of the Secretary of State.

(3) Issue a certificate of amendment to which shall be affixed the copy.

B. The certificate of amendment, together with the copy of the articles of amendment affixed thereto by the Secretary of State shall be delivered to the limited liability company or its representative.

### Effect of certificate of amendment

Art. 3.08. A. Upon the issuance of the certificate of amendment by the Secretary of State, the amendment shall become effective and the articles of organization shall be amended accordingly.

B. No amendment shall affect any existing cause of action in favor of or against such limited liability company or any pending suit to which such limited liability company shall be a party, or the existing rights of persons other than members, and, in the event the limited liability company name shall be changed by amendment, no suit brought by or against such limited liability company under its former name shall abate for that reason.

### PART FOUR

### Admission of members

Art. 4.01. A. In connection with the formation of a limited liability company, a person acquiring an interest as a member becomes a member on the latter of:

(1) the date of formation of the limited liability company; or

(2) the date stated in the records of the limited liability company as the date that the person becomes a member or, if no date is stated in those records, on the date that the person's admission is first reflected in the records of the limited liability company.

B. After the formation of a limited liability company, a person becomes a new member:

(1) in the case of a person acquiring a membership interest directly from the limited liability company, on compliance with the provisions of the regulations governing admission of new members or, if the regulations contain no relevant admission provisions, on the written consent of all members; and

(2) in the case of an assignee of a membership interest, as provided by Section A of Article 4.07 of this Act.

C. Any person may be a member unless the person lacks capacity apart from this Act.

### Classes and voting

Art. 4.02. A. The regulations may establish classes or groups of one or more members having certain expressed relative rights, powers, and duties, including voting rights, and may provide for the future creation, in the manner provided in the regulations, of additional classes or groups of members having certain relative rights, powers, or duties, including voting rights, expressed either in the regulations or at the time of creation. The rights, powers, or duties of a class or group may be

senior to those of one or more existing classes or groups of members.

B. Regulations that grant or make provision for granting to any of its members a right to vote may contain provisions relating to:

(1) notice of the time, place, or purpose of a meeting at which a matter is to be voted on by any members;

(2) waiver of a notice;

(3) action by consent without a meeting;

(4) the establishment of a record date;

(5) quorum requirements;

(6) voting in person or by proxy; or

(7) any other matter relating to the exercise of the right to vote.

C. Prompt notice of the taking of an action under regulations that require less than unanimous written consent of the members and that may be taken without a meeting shall be given to the members who have not consented in writing to the taking of the action.

D. For the purposes of this section, the taking of an action includes amending the regulations or creating, under provisions of the regulations, a class of membership interests that was not previously outstanding.

### Liability to third parties

Art. 4.03. A. Except as and to the extent the regulations specifically provide otherwise, a member or manager is not liable for the debts, obligations or liabilities of a limited liability company including under a judgment decree, or order of a court.

B. Transaction of business outside state. It is the intention of the legislature by the enactment of this Act that the legal existence of limited liability companies formed under this Act be recognized beyond the limits of this state and that, subject to any reasonable registration requirements, any such limited liability company transacting business outside this state be granted the protection of full faith and credit under Section 1 of Article IV of the Constitution of the United States.

C. Parties to actions. A member of a limited liability company is not a proper party to proceedings by or against a limited liability company, except where the object is to enforce a member's right against or liability to the limited liability company.

### Nature of membership interest

Art. 4.04. A. A membership interest is personal property. A member has no interest in specific limited liability company property.

### Assignment of membership interest

Art. 4.05. A. Unless otherwise provided by the regulations:

(1) a membership interest is assignable in whole or in part;

(2) an assignment of a membership interest does not entitle the assignee to become, or to exercise rights or powers of, a member;

(3) an assignment entitles the assignee to receive distributions, to which the assignor was entitled, to the extent those items are assigned; and

(4) until the assignee becomes a member, the assignor member continues to be a member and to have the power to exercise any rights or powers of a member, except to the extent those rights or powers are assigned.

B. The regulations may provide that a member's membership interest may be evidenced by a certificate of membership interest issued by the limited liability company, may provide for the assignment or transfer of membership interests represented by a certificate, and may make other provisions with respect to the certificate.

### Rights of judgment creditor

Art. 4.06. A. On application to a court of competent jurisdiction by a judgment creditor of a member or any other owner of a membership interest, the court may charge the membership interest of the member or other owner with payment of the unsatisfied amount of the judgment. Except as otherwise provided in the regulations to the extent that the membership interest is charged in this manner, the judgment creditor has only the rights of an assignee of the interest. This Section does not deprive any member of the benefit of any exemption laws applicable to that member's membership interest.

### Right of assignee to become member

Art. 4.07. A. An assignee of a membership interest may become a member if and to the extent that:

(1) the regulations provide; or

(2) all members consent.

B. An assignee who becomes a member has, to the extent assigned, the rights and powers and is subject to the restrictions and liabilities of a member under the regulations and this Act. Unless otherwise provided by regulations, an assignee who becomes a member also is liable for the obligations of the assignor to make contributions but is not obligated for liabilities unknown to the assignee at the time the assignee became a member and which could not be ascertained from the regulations.

C. Whether or not an assignee of a membership interest becomes a member, the assignor is not released from the assignor's liability to the limited liability company.

## PART FIVE

### Form of contribution

Art. 5.01. A. The contribution of a member may be in cash, property, or services rendered, or a promissory note or other obligation to pay cash or transfer property to the limited liability company.

### Liability for contribution obligations

Art. 5.02. A. A promise by a member to make a contribution to, or otherwise pay cash or transfer property to, a limited liability company is not enforceable unless set out in writing and signed by the member.

B. Except as otherwise provided by the articles of organization or regulations, a member or the member's representative or successor is obligated to the limited liability company to perform an enforceable promise to make a contribution to or otherwise pay cash or transfer property to a limited liability company, notwithstanding the member's death, disability, or other change in circumstances. If a member's legal representative or successor does not make a contribution or other payment of cash or transfer of property required by the enforceable promise, whether as a contribution or with respect to a contribution previously made, that member or the member's legal representative or successor is obligated, at the option of the limited liability company, to pay to the limited liability company an amount of cash equal to that portion of the agreed value, as stated in the regulations or in the limited liability company records required to be kept under Article 2.22 of this act, of the contribution represented by the amount of cash that has not been paid or the value of the property that has not been transferred.

C. The regulations may provide that the interest of a member who fails to make a payment of cash or transfer of property to the limited liability company, whether as a contribution or with respect to a contribution previously made, required by an enforceable promise is subject to specified consequences. A consequence may take the form of a reduction of the defaulting member's percentage or other interest in the limited liability company, subordination of the member's interest to that of nondefaulting members, a forced sale of the member's interest, forfeiture of the member's interest, the lending of money to the defaulting member by other members of the amount necessary to meet the defaulting member's commitment, a determination of the value of the defaulting member's interest by appraisal or by formula and redemption or sale of the interest at that value, or other penalty or consequence.

D. Unless otherwise provided by the regulations, the obligation of a member or a member's legal representative or successor to make a contribution or otherwise pay cash or transfer property or to return cash or property paid or distributed to the member in violation of this Act or the regulations may be compromised or released only by consent of all of the members. Notwithstanding the compromise or release, a creditor of a limited liability company who extends credit or otherwise acts in reasonable reliance on that obligation, after the member signs a writing that reflects the obligation and before the writing is amended or canceled to reflect the compromise or release, may enforce the original obligation.

### Sharing of distributions

Art. 5.03. A. Distributions of cash or other assets of a limited liability company shall be made to the members in the manner provided by the regulations. If the regulations do not otherwise provide, distributions shall be made on the basis of the agreed value, as stated in the records required to be kept under Article 2.22 of this Act, of the contributions made by each member.

### Interim distributions

Art. 5.04. A. Except as otherwise provided by this Article, a member is entitled to receive distributions from a limited

liability company before the member's withdrawal from the limited liability company and before the winding up of the limited liability company to the extent and at the times or on the occurrence of the events specified in the regulations.

Resignation of member

Art. 5.05. A. A member may withdraw from a limited liability company at the time or on the occurrence of events specified in the regulations.

Distribution on withdrawal

Art. 5.06. A. Except as otherwise provided by this Act, the articles of organization or the regulations, on withdrawal, any withdrawing member is entitled to receive, within a reasonable time after withdrawal, the fair value of that member's interest in the limited liability company as of the date of withdrawal.

Distribution in kind

Art. 5.07. A. Except as provided by the articles of organization or regulations, a member, regardless of the nature of the member's contribution, may not demand or receive a distribution from a limited liability company in any form other than cash.

Right to distribution

Art. 5.08. A. Subject to Articles 5.09 and 6.04 of this act, at the time that a member becomes entitled to receive a distribution, with respect to a distribution, that member has the status of and is entitled to all remedies available to a creditor of the limited liability company.

Limitation on distribution

Art. 5.09. A. A limited liability company may not make a distribution to its members to the extent that, immediately after giving effect to the distribution, all liabilities of the limited liability company, other than liabilities to members with respect to their interests and liabilities for which the recourse of creditors is limited to specified property of the limited liability company, exceed the fair value of the limited liability company assets, except that the fair value of property that is subject to a liability for which recourse of creditors is limited shall be included in the limited liability company assets only to the extent that the fair value of that property exceeds that liability.
B. A member who receives a distribution that is not permitted under Section A of this Article has no liability under this Act to return the distribution unless the member knew that the distribution violated the prohibition of Section A. This Section does not affect any obligation of the members under the regulations or other applicable law to return the distribution.

PART SIX

Dissolution

Art. 6.01. A. A limited liability company shall be dissolved on the first of the following to occur:
(1) When the period fixed for the duration of the limited liability company expires.
(2) On the occurrence of events specified in the articles of organization or regulations to cause dissolution.
(3) Written consent of all members to dissolution.
(4) Except as otherwise provided in the regulations, upon the death, retirement, resignation, expulsion, bankruptcy, or dissolution of a member or the occurrence of any other event which terminates the continued membership of a member in the limited liability company, unless there is at least one remaining member and the business of the limited liability company is continued by the consent of the number of members or class thereof stated in the articles of organization or regulations of the limited liability company or if not so stated, by all remaining members.
(5) Entry of a decree of judicial dissolution under Section 6.02 of this Act.

Judicial dissolution

Art. 6.02. A. On application by or for a member, a court of competent jurisdiction may decree dissolution of a limited

liability company if it is not reasonably practicable to carry on the business of the limited liability company in conformity with its articles of organization and regulations.

## Winding up

**Art. 6.03. A.** On the dissolution of a limited liability company, the limited liability company's affairs shall be wound up as soon as reasonably practicable. The winding up shall be accomplished by the managers or members. In addition, a court of competent jurisdiction, on cause shown, may wind up the limited liability company's affairs on application of any member or the member's legal representative or assignee and, in connection with the winding up, may appoint a person to carry out the liquidation and may make all other orders, directions, and inquiries that the circumstances require.

## Transfer of assets

**Art. 6.04. A.** On the winding up of a limited liability company, its assets shall be paid or transferred as follows:

(1) To the extent otherwise permitted by law, to creditors, including members who are creditors in satisfaction of liabilities (other than for distributions) of the limited liability company, whether by payment or by establishment of reserves;

(2) Unless otherwise provided by the articles of organization or regulations, to members and former members in satisfaction of the company's liability for distributions; and

(3) Unless otherwise provided by the articles of organization or regulations, to members in the manner provided in Article 5.04.

## Procedure before filing articles of dissolution

**Art. 6.05. A.** Before filing articles of dissolution:

(1) The limited liability company shall cease to carry on its business, except insofar as may be necessary for the winding up thereof.

(2) The limited liability company shall cause written notice by registered or certified mail of its intention to dissolve to be mailed to each known creditor of and claimant against the limited liability company.

(3) The limited liability company shall proceed to collect its assets, convey and dispose of such of its properties as are not to be distributed in kind to its members, pay, satisfy or discharge its liabilities and obligations, or make adequate provisions for payment and discharge thereof, and do all other acts required to liquidate its business and affairs; in case its property and assets are not sufficient to satisfy or discharge all the limited liability company's liabilities and obligations, the limited liability company shall apply them so far as they will go to the just and equitable payment of the liabilities and obligations. After paying or discharging all of its obligations, or making adequate provisions for payment and discharge thereof, the limited liability company shall then distribute the remainder of its assets, either in cash or in kind, among its shareholders according to their respective rights and interest.

(4) The limited liability company, at any time during the liquidation of its business and affairs, may make application to any district court of this state in the county in which the registered office of the limited liability company is situated to have the liquidation continued under the supervision of such court as provided in this Act.

## Revocation of voluntary dissolution proceedings

**Art. 6.06. A.** At any time before the issuance of a certificate of dissolution by the Secretary of State, a limited liability company may revoke voluntary dissolution proceedings by the written consent of all its members.

**B.** Upon the revocation of voluntary dissolution proceedings the limited liability company may again carry on its business.

## Articles of dissolution

**Art. 6.07. A.** If voluntary dissolution proceedings have not been revoked, then, when all liabilities and obligations of the limited liability company have been paid or discharged, or adequate provision has been made thereof, or in case its property and assets are not sufficient to satisfy and discharge all the limited liability company's liabilities and obligations, then when all the property and assets have been applied so far as they will go to the just and equitable payment of the limited liability company's liabilities and obligations, and all of the remaining property and assets of the limited liability have been distributed to its members according to their respective rights and interest, articles of dissolution shall be executed on behalf of the limited liability company by a manager or authorized member, which shall set forth:

(1) The name of the limited liability company.

(2) The names and respective addresses of its managers.

(3) That all debts, obligations, and liabilities of the limited liability company have been paid or discharged or that adequate provision has been made therefor, or, in case the limited liability company's property and assets were not sufficient to satisfy and discharge all its debts, liabilities, and obligations, that all property and assets have been applied so far as they will go to the payment thereof in a just and equitable manner and that no property or assets remain available for distribution among its members.

(4) That all remaining property and assets of the limited liability company have been distributed among its members in accordance with their respective rights and interest or that no property remained for distribution to members after applying it as far as it would go to the just and equitable payment of the debts, liabilities, and obligations of the limited liability company.

(5) There are no suits pending against the limited liability company in any court, or that adequate provisions have been made for satisfaction of any judgment, order, or decree which may be entered against it in any pending suit.

(6) If the limited liability company elected to dissolve by written consent of all members:

(a) A copy of the written consent to dissolve, and a statement that such written consent has been signed by all members of the limited liability company or signed in their names by their attorneys thereunto duly authorized.

## Filing articles of dissolution

Art. 6.08. A. The original and a copy of such articles of dissolution shall be delivered to the Secretary of State. If the Secretary of State finds that such articles of dissolution conform to law, the Secretary of State shall, when the appropriate filing fee is paid as required by law:

(1) Endorse on the original and copy the word "Filed," and the month, day, and year of the filing thereof.

(2) File the original in the Secretary of State's office.

(3) Issue a certificate of dissolution to which there shall be affixed the copy.

B. The certificate of dissolution, together with the copy of the articles of dissolution affixed thereto by the Secretary of State, shall be delivered to the representative of the dissolved limited liability company. Upon the issuance of such certificate of dissolution the existence of the limited liability company shall cease, except for the purpose of suits, other proceedings in appropriate limited liability company action by members, managers and representatives as provided by the laws of this state.

## PART SEVEN

### Admission of foreign limited liability company

Art. 7.01. A. No foreign limited liability company shall have the right to transact business in this State until it shall have procured a certificate of authority so to do from the Secretary of State. No foreign limited liability company shall be entitled to procure a certificate of authority under this Act to transact in this State any business which a limited liability company organized under this Act is not permitted to transact. A foreign limited liability company shall not be denied a certificate of authority by reason of the fact that the laws of the State or country under which such limited liability company is organized governing its organization and internal affairs differ from the laws of this State, and nothing in this Act contained shall be construed to authorize this State to regulate the organization of such limited liability company or its internal affairs.

B. Without excluding other activities which may not constitute transaction of business in this state, a foreign limited liability company shall not be considered to be transacting business in this state, for the purposes of this Act, by reason of carrying on in this state any one (1) or more of the following activities:

(1) Maintaining or defending any action or suit or any administrative or arbitration proceedings, or effecting the settlement thereof or the settlement of claims or disputes to which it is a party;

(2) Holding meetings of its members or managers or carrying on other activities concerning its internal affairs;

(3) Maintaining bank accounts;

(4) Maintaining offices or agencies for the transfer, exchange, and registration of securities issued by it, or appointing and maintaining trustees or depositaries with relation to its securities;

(5) Voting the stock or other equity interest of any person;

(6) Effecting sales through independent contractors;

(7) Creating as borrower or lender, or acquiring, indebtedness or mortgages or other security interests in real or personal property;

(8) Securing or collecting debts due to it or enforcing any rights in property securing the same;

(9) Transacting any business in interstate commerce;

(10) Conducting an isolated transaction completed within a period of thirty (30) days and not in the course of a number of repeated transactions of like nature;

(11) Exercising the powers of executor or administrator of the estate of a non-resident decedent under ancillary letters issued by a court of this state, or exercising the powers of a trustee under the will of a non-resident decedent, or under a trust created by one or more non-residents of this state, or by one or more foreign limited liability companies if the exercise of such powers, in any such case, will not involve activities which would be deemed to constitute the transacting of business in this state in the case of a foreign limited liability company acting in its own right;

(12) Acquiring, in transactions outside Texas, or in interstate commerce, of debts secured by mortgages or liens on real or personal property in Texas, collecting or adjusting of principal and interest payments thereon, enforcing or adjusting any rights and property securing said debts, taking any actions necessary to preserve and protect the interest of the mortgagee in said security, or any combination of such transactions;

(13) Investing in or acquiring, in transactions outside of Texas, royalties and other non-operating mineral interests, and the execution of division orders, contracts of sale and other instruments incidental to the ownership of such non-operating mineral interests.

Powers of foreign limited liability company

Art. 7.02. A. A foreign limited liability company which shall have received a certificate of authority under this Act shall, until its certificate of authority shall have been revoked in accordance with the provisions of this Act or until a certificate of withdrawal shall have been issued by the Secretary of State as provided in this Act, enjoy the same, but no greater, rights and privileges as a domestic limited liability company organized for the purposes set forth in the application pursuant to which such certificate of authority is issued; and, as to all matters affecting the transaction of intrastate business in this State, it and its managers and members shall be subject to the same duties, restrictions, penalties, and liabilities now or hereafter imposed upon a domestic limited liability company of like character and its managers and members; provided, however, that only the laws of the jurisdiction of organization of a foreign limited liability company shall govern (1) the internal affairs of the foreign limited liability company, including but not limited to the rights, powers, and duties of its manager and members and matters relating to its ownership, and (2) the liability, if any, of members of the foreign limited liability company for the debts, liabilities and obligations of the foreign limited liability company for which they are not otherwise liable by statute or agreement.

Limited liability company name of foreign limited liability company

Art. 7.03. A. No certificate of authority shall be issued to a foreign limited liability company unless the limited liability company name of such limited liability company:

(1) Shall contain the word "Limited" or the abbreviations "Ltd." or "L.C." and shall contain such additional words as may be required by law.

(2) Shall not contain any word or phrase which indicates or implies that it is organized for any purpose other than one or more of the purposes contained in its articles of organization.

(3) Shall not be the same as, or deceptively similar to, the name of any domestic limited liability company, corporation or limited partnership existing under the laws of this state or of any foreign limited liability company, corporation or limited partnership authorized to transact business in this state, or a name the exclusive right to which is, at the time, reserved or registered in the manner provided in this Act or any other statute relating to corporations, partnerships, or other business entities; provided that a name may be similar if written consent is obtained from the existing limited liability company, corporation or limited partnership having the name deemed to be similar or the person, or limited liability company, for whom the name deemed to be similar is reserved or registered in the office of the Secretary of State. A certificate of authority shall be issued as provided in this Act to any foreign limited liability company having a name the same as, deceptively similar to, or, if no consent is given, similar to the name of any limited liability company existing under the laws of this state or of any foreign limited liability company authorized to transact business in this state, or a name the exclusive right to which is, at the time, reserved or registered, provided such foreign limited liability company qualifies and does business under a name that meets the requirements of this article. The foreign limited liability company shall set forth in the application for a certificate of authority the name under which it is qualifying and shall file an assumed name certificate as required by law.

Change of name by foreign limited liability company

Art. 7.04. A. Whenever a foreign limited liability company which is authorized to transact business in this state shall change its name to one under which a Certificate of Authority would not be granted to it on application therefor, the Certificate of Authority of such foreign limited liability company shall be suspended and it shall not thereafter transact any business in this state until it has changed its name to a name which is available to it under the laws of this State or has otherwise complied with the provisions of this act.

#### Application for certificate of authority

Art. 7.05. A. In order to procure a Certificate of Authority to transact business in this State, a foreign limited liability company shall make application therefor to the Secretary of State, which application shall set forth:
(1) The name of the foreign limited liability company in the state or country under the laws of which it is organized.
(2) If the name of the limited liability company does not contain the word "Limited," "Ltd.," or "L.C." then the name of the foreign limited liability company with the word or abbreviation which it elects to add thereto for use in this state; if the foreign limited liability company is required to qualify under a name other than its foreign limited liability company name, then the name under which the foreign limited liability company is to be qualified.
(3) The date of organization and the period of duration of the foreign limited liability company.
(4) The address of the principal office of the foreign limited liability company in the state or country under the laws of which it is organized.
(5) The address of the registered office of the foreign limited liability company in this state, and the name of its registered agent in this state at such address.
(6) The purpose or purposes of the foreign limited liability company which it proposes to pursue in the transaction of business in this state and a statement that it is authorized to pursue such purpose or purposes in the state or country under the laws of which it is organized.
(7) The names and respective addresses of the managers of the foreign limited liability company.
B. Such application shall be made on forms promulgated by the Secretary of State and shall be executed on behalf of the foreign limited liability company by an authorized manager or member.

#### Filing of application for certificate of authority

Art. 7.06. A. The original and a copy of the application of the foreign limited liability company for a Certificate of Authority shall be delivered to the Secretary of State, together with a certificate issued by an authorized officer of the jurisdiction of the foreign limited liability company's organization evidencing its existence. If the certificate is in a language other than English, a translation of the certificate, under the oath of the translator, must be attached to the certificate. The certificate must be dated after the 91st day preceding the date on which the application is filed. If the Secretary of State finds that the application conforms to law, the Secretary of State shall, when the appropriate filing fee is paid as required by law:
(1) Endorse on the original and a copy the word "filed," and the month, day, and year of filing thereof.
(2) File in the office of the Secretary of State the original and a certificate evidencing the foreign limited liability company existence.
(3) Issue a Certificate of Authority to transact business in this state to which there shall be affixed the copy.
B. The Certificate of Authority, together with a copy of the application affixed thereto by the Secretary of State, shall be delivered to the foreign limited liability company or its representative.

#### Effect of certificate of authority

Art. 7.07. A. Upon the issuance of a Certificate of Authority by the Secretary of State, the foreign limited liability company shall be authorized to transact business in this State for those purposes set forth in its application, and such certificate shall be conclusive evidence of such right of the foreign limited liability company to transact business in the State for such purposes, except as against this State, in preceding to revoke such certificate.

#### Amended certificate of authority

Art. 7.08. A. If a foreign limited liability company authorized to transact business in this State shall change its foreign limited liability company name, or if such foreign limited liability company desires to pursue in this State purposes other than, or in addition to, those authorized by its existing certificate of authority, it shall procure an amended certificate of authority by making application therefor to the Secretary of State.
B. To change any statement on an original application for a certificate of authority a foreign limited liability company shall

file with the Secretary of State an application for an amended certificate of authority setting forth the change.

C. An application for an amended certificate of authority submitted because of a name change must be accompanied by a certificate from the proper filing officer in the jurisdiction of organization evidencing the name change.

D. The requirements in respect to the form and contents of such application, the manner of its execution, the filing of the application and a copy of it with the Secretary of State, the issuance of an amended certificate of authority and the effect thereof, shall be the same as in the case of an original application for a certificate of authority.

### Withdrawal or termination of foreign limited liability company

Art. 7.09. A. A foreign limited liability company authorized to transact business in this state may withdraw from this state upon procuring from the Secretary of State a certificate of withdrawal. In order to procure such certificate of withdrawal, such foreign limited liability company shall deliver to the Secretary of State an application for withdrawal, which shall set forth:

(1) The name of the foreign limited liability company and the state or country under the laws of which it is organized;

(2) That the foreign limited liability company is not transacting business in this state;

(3) That the foreign limited liability company surrenders its authority to transact business in this state;

(4) That the foreign limited liability company revokes the authority of its registered agent in this state to accept service of process and consents that service of process in any action, suit, or proceeding based upon any cause of action arising in this state during the time the foreign limited liability company was authorized to transact business in this state may thereafter be made on such foreign limited liability company by service thereof on the Secretary of State;

(5) A post office address to which the Secretary of State may mail a copy of any process against the foreign limited liability company that may be served on him;

(6) A statement that all sums due, or accrued, to this state have been paid, or that adequate provision has been made for the payment thereof;

(7) A statement that all known creditors or claimants have been paid or provided for and that the foreign limited liability company is not involved in or threatened with litigation in any court in this state.

B. The application for withdrawal may be made on forms promulgated by the Secretary of State and shall be executed on behalf of the foreign limited liability company by an authorized manager or member.

C. When the existence of a foreign limited liability company terminates because of dissolution, merger, or otherwise, a certificate from the proper officer in the jurisdiction of the foreign limited liability company's organization evidencing the termination shall be filed with the Secretary of State.

### Filing of application for withdrawal

Art. 7.10. A. The original and a copy of such application for withdrawal shall be delivered to the Secretary of State. If the Secretary of State finds that such application conforms to the provisions of this Act, the Secretary of State shall, when all fees and any taxes have been paid as required by law:

(1) Endorse on the original and the copy the word "Filed," and the month, day, and year of the filing thereof.

(2) File the original in the Secretary of State's office.

(3) Issue a certificate of withdrawal to which there shall be affixed the copy.

B. The certificate of withdrawal, together with the copy of the application for withdrawal affixed thereto by the Secretary of State, shall be delivered to the foreign limited liability company or its representative. Upon the issuance of such certificate of withdrawal, the authority of the foreign limited liability company to transact business in this State shall cease.

### Revocation of certificate of authority

Art. 7.11. A. The certificate of authority of a foreign limited liability company to transact business in this state may be revoked by a decree of the district court for the county in which the registered office of the foreign limited liability company in this state is situated or of any district court in Travis County in an action filed by the Attorney General when it is established that:

(1) The foreign limited liability company has failed to comply with a condition precedent to the issuance of its certificate of authority or a renewal or amendment thereof; or

(2) The certificate of authority to transact business in this state or any amendment thereof was procured through fraud; or

(3) The foreign limited liability company has continued to transact business beyond the scope of the purpose or purposes expressed in its certificate of authority to transact business in this state; or

(4) A misrepresentation has been made of any material matter in any application, report, affidavit, or other document submitted by such foreign limited liability company as required by law.

B. The certificate of authority of a foreign limited liability company to transact business in this state may be revoked by order of the Secretary of State when it is established that it is in default in any of the following particulars:

(1) The foreign limited liability company has failed to file any report within the time required by law, or has failed to pay any fees, taxes, or penalties prescribed by law when the same have become due and payable; or

(2) The foreign limited liability company has failed to maintain a registered agent in this state as required by law; or

(3) The foreign limited liability company has changed its name and has failed to file with the Secretary of State within thirty days after such change of name became effective, an application for an amended certificate of authority, or that the foreign limited liability company has changed its foreign limited liability company name and that the newly adopted name is not available for use in this state; or

(4) The foreign limited liability company has failed to pay the filing fee for the foreign limited liability company certificate of authority or any required tax deposit, or the fee or any tax was paid by an instrument that was dishonored when presented by the state for payment.

C. (1) No foreign limited liability company shall have its certificate of authority to transact business in this state revoked under Subsection (1), (2), or (3) of Section B hereof unless the Secretary of State, or other state agency to which such report, taxes, fees, penalties is required to be made, gives the foreign limited liability company not less than 90 days notice of its neglect, delinquency, or omission by certified mail addressed to its registered office or to its principal place of business, or to the last known address of one of its managers, or to any other known place of business of said foreign limited liability company, and the foreign limited liability company has failed prior to such revocation to correct the neglect, omission or delinquency.

(2) When the certificate of authority of a foreign limited liability company to transact business in this state is revoked under Subsection (4) of Section B of this article, the Secretary of State shall give the foreign limited liability company notice of the revocation by regular mail addressed to its registered office, its principal place of business, the last known address of one of its managers or members or any other known place of business of the foreign limited liability company.

D. Whenever a foreign limited liability company has given cause for revocation of its certificate of authority and has failed to correct the neglect, omission or delinquency as provided in Sections B and C, the Secretary of State shall thereupon revoke the certificate of authority of the foreign limited liability company by issuing a certificate of revocation which shall include the fact of such revocation and the date and cause thereof. The original of such certificate shall be placed in the Secretary of State's office and a copy thereof mailed to the foreign limited liability company at its registered office or to its principal place of business, or to the last known address of one of its managers, or to any other known place of business of said foreign limited liability company. Upon the issuance of such certificate of revocation, the authority to transact business in this state shall cease.

E. Any foreign limited liability company whose certificate of authority has been revoked by the Secretary of State under the provisions of Section B of this article may be reinstated by the Secretary of State at any time within a period of 12 months from the date of dissolution, upon approval of an application for reinstatement signed by a manager or member of the foreign limited liability company. Such application shall be filed by the Secretary of State whenever it is established to the Secretary of State's satisfaction that in fact there was no cause for the revocation, or whenever the neglect, omission or delinquency resulting in revocation has been corrected and payment made of all fees, taxes, penalties and interest due thereon which accrued before the revocation plus an amount equal to the total taxes from the date of revocation to the date of reinstatement which would have been payable had the foreign limited liability company certificate not been revoked. A reinstatement filing fee of $50 shall accompany the application for reinstatement.

Reinstatement shall not be authorized if the foreign limited liability company name is the same as or deceptively similar to a foreign limited liability company, corporation or limited partnership name already on file or reserved or registered, unless the foreign limited liability company being reinstated contemporaneously amends its certificate of authority to change its name.

When the application for reinstatement is approved and filed by the Secretary of State, the foreign limited liability company authority to do business in Texas shall be deemed to have continued without interruption from the date of revocation, except that reinstatement shall have no effect upon any issue of personal liability of the manager or member, or agents of the foreign limited liability company during the period between revocation and reinstatement.

F. When a foreign limited liability company is convicted of a felony, or when a high managerial agent is convicted of a felony committed in the conduct of the affairs of the foreign limited liability company, the Attorney General may file an action to revoke the certificate of authority of the foreign limited liability company to transact business in this State in a district court of the county in which the registered office of the foreign limited liability company in this State is situated or in a district court of Travis County. The court may revoke the foreign limited liability company's certificate of authority if it is

established that:

(1) The foreign limited liability company, or a high managerial agent acting in behalf of the foreign limited liability company has engaged in a persistent course of felonious conduct; and

(2) To prevent future felonious conduct of the same character, the public interest requires such revocation.

## Filing of decree of revocation

Art. 7.12. A. In case a court shall enter a decree revoking the certificate of authority of a foreign limited liability company to transact business in this State, it shall be the duty of the clerk of such court to cause a certified copy of the decree to be filed with the Secretary of State. No fee shall be charged by the Secretary of State for the filing thereof.

## Transacting business without certificate of authority

Art. 7.13. A. No foreign limited liability company which is transacting, or has transacted, business in this State without a certificate of authority shall be permitted to maintain any action, suit, or proceeding in any court of this State (whether brought directly by the foreign limited liability company or in the form of a derivative action by a member) on any cause of action arising out of the transaction of business in this State, until such foreign limited liability company shall have obtained a certificate of authority. Nor shall any action, suit, or proceeding on any such cause of action be maintained in any court of this State by a successor, assignee, or legal representative of such foreign limited liability company until a certificate of authority shall have been obtained by such foreign limited liability company or by a foreign limited liability company on which has acquired all or substantially all of its assets. It is expressly provided, however, that the provisions of this article shall not affect the rights of any assignee of the foreign limited liability company as the holder in due course of a negotiable promissory note, check or bill of exchange, or as the bona fide purchaser for value of a warehouse receipt, stock certificate, or other instrument made negotiable by law.

B. The failure of a foreign limited liability company to obtain a certificate of authority to transact business in this State shall not impair the validity of any contract or act of such foreign limited liability company, and shall not prevent such foreign limited liability company from defending any action, suit or proceeding in any court of this State.

C. A foreign limited liability company which transacts business in this State without a certificate of authority shall be liable to this State, for the years or parts thereof during which it transacted business in this State without a certificate of authority, in an amount equal to all fees any taxes which would have been imposed by law upon such foreign limited liability company had it duly applied for and received a certificate of authority to transact business in this State as required by law and thereafter filed all reports required by law, plus all penalties imposed by law for failure to pay such fees and taxes. In addition to the penalties and payments thus prescribed, such foreign limited liability company shall forfeit to this State an amount not less than One Hundred Dollars ($100) nor more than Five Thousand Dollars ($5,000) for each month or fraction thereof it shall have transacted business in this State without a certificate. The Attorney General shall bring suit to recover all amounts due this State under the provisions of this section.

## PART EIGHT

### Interrogatories by secretary of state

Art. 8.01. A. The Secretary of State may propound to any limited liability company, domestic or foreign, subject to the provisions of this Act, and to any manager thereof, such interrogatories as may be reasonably necessary and proper to enable the Secretary of State to ascertain whether such limited liability company has complied with all the provisions of this Act. Such interrogatories shall be answered within thirty days after the mailing thereof, or within such additional time as shall be fixed by the Secretary of State, and the answers thereto shall be full and complete and shall be made in writing and under oath. If such interrogatories be directed to an individual, they shall be answered by such individual, and if directed to a limited liability company, they shall be answered by an authorized manager or member of the limited liability company. The Secretary of State need not file any document to which such interrogatories relate until such interrogatories be answered as herein provided, and not then if the answers thereto disclose that such document is not in conformity with the provisions of this Act. The Secretary of State shall certify to the Attorney General, for such action as the Attorney General may deem appropriate, all interrogatories and answers thereto which disclose a violation of the provisions of this Act.

### Information disclosed by interrogatories

Art. 8.02. A. Interrogatories propounded by the Secretary of State and the answers thereto shall not be open to public inspection nor shall the Secretary of State disclose any facts or information obtained therefrom except insofar as official duty may require the same to be made public or in the event such interrogatories or the answers thereto are required for evidence in any criminal proceedings or in any other action by this State.

### Powers of Secretary of State

Art. 8.03. A. The Secretary of State shall have the power and authority reasonably necessary to enable the Secretary of State to administer this Act efficiently and to perform the duties therein imposed upon the Secretary of State.

### Appeals from Secretary of State

Art. 8.04. A. If the Secretary of State shall fail to approve any articles of organization, application for certificate of authority to transact business in this State, amendment, merger, consolidation, or dissolution, or any other document required by this Act to be approved by the Secretary of State before the same shall be filed in the office of the Secretary of State, the Secretary of State shall, within ten days after the delivery thereof to the Secretary of State, give written notice of disapproval to the person or limited liability company, domestic or foreign, delivering the same, specifying in such notice the reasons therefor. From such disapproval, such person or limited liability company may appeal to any district court of Travis County by filing with the clerk of such court a petition setting forth a copy of the articles or other document sought to be filed and a copy of the written disapproval thereof by the Secretary of State; whereupon the matter shall be tried de novo by the court, and the court shall either sustain the action of the Secretary of State or direct the Secretary of State to take such action as the court may deem proper.

B. Appeals from all final orders and judgments entered by the district court under this Article in review of any ruling or decision of the Secretary of State may be taken as in other civil actions.

### Certificates and certified copies to be received in evidence

Art. 8.05. A. All certificates issued by the Secretary of State in accordance with the provisions of this Act, and all copies of documents filed in the office of the Secretary of State in accordance with the provisions of this Act, when certified by the Secretary of State, shall be taken and received in all courts, public offices, and official bodies as prima facie evidence of the facts therein stated, and shall be subject to recordation. A certificate by the Secretary of State, under the great seal of this State, as to the existence or non-existence of the facts relating to limited liability companies which would not appear from a certified copy of any of the foregoing documents or certificates shall be taken and received in all courts, public offices, and official bodies as prima facie evidence of the existence or non-existence of the facts therein stated.

### Forms promulgated by Secretary of State

Art. 8.06. A. Forms may be promulgated by the Secretary of State for all reports and all other documents required to be filed in the office of the Secretary of State. The use of such forms, however, shall not be mandatory, except in instances in which the law may specifically so provide.

### Time for filing documents in the office of the Secretary of State

Art. 8.07. A. Whenever any document is required to be filed in the office of the Secretary of State by any provision of this Act, the requirement of the statute shall be construed to involve the requirement that same be so filed with reasonable promptness.

### Waiver of notice

Art. 8.08. A. Whenever any notice is required to be given to any managers or members of a limited liability company under the provisions of this Act or under the provisions of the articles of organization or regulations of the limited liability company, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be equivalent to the giving of such notice.

### Application to foreign and interstate commerce

Art. 8.09. A. The provisions of this Act shall apply to commerce with foreign nations and among the several states only insofar as the same may be permitted under the provisions of the Constitution of the United States.

### Reservation of power

Art. 8.10. A. The Legislature shall at all times have power to prescribe such regulations, provisions, and limitations as it may deem advisable, which regulations, provisions, and limitations shall be binding upon any and all limited liability companies subject to the provisions of this Act, and the Legislature shall have power to amend, repeal, or modify this Act.

### Effect of invalidity of part of this Act

Art. 8.11. A. If a court of competent jurisdiction shall adjudge to be invalid or unconstitutional any clause, sentence, subsection, section, or Article of this Act, such judgment or decree shall not affect, impair, invalidate, or nullify the remainder of this Act, but the effect thereof shall be confined to the clause, sentence, subsection, section, or Article of this Act so adjudged to be invalid or unconstitutional.

### Applicability of other statutes

Art. 8.12. To the extent this Act contains no provision with respect to one of the matters provided for in the TBCA or the Texas Miscellaneous Corporation Laws Act as such acts shall be amended from time to time, the provisions of the TBCA and the Texas Miscellaneous Corporation Laws Act shall supplement the provisions of this Act to the extent they are not inconsistent with the provisions of this Act. Without limiting the generality of the foregoing, Article 5 of the TBCA shall supplement the provisions of this Act and a limited liability company shall be an "other entity" as that term is defined in the TBCA and Article 7.06 of the Texas Miscellaneous Corporation Laws Act shall be applicable to limited liability company managers to the same extent as to directors.

### PART NINE

### Filing and filing fees

Art. 9.01. A. The Secretary of State is authorized and required to collect for the use of the State the following fees:

(1) Filing articles of organization of a domestic limited liability company and issuing the certificate of organization, Two Hundred Dollars ($200.00).

(2) Filing articles of amendment of a domestic limited liability company and issuing the certificate of amendment, One Hundred Dollars ($100.00).

(3) Filing articles of merger involving a domestic or foreign limited liability company, Two Hundred Dollars ($200.00).

(4) Filing an application of a foreign limited liability company for certificate of authority to transact business in this state and issuing such a certificate of authority, Five Hundred Dollars ($500.00).

(5) Filing an application of a foreign limited liability company for an amended certificate of authority to transact business in this state and issuing such an amended certificate of authority, One Hundred Dollars ($100.00).

(6) Filing restated articles of organization of a domestic limited liability company, Two Hundred Dollars ($200.00).

(7) Filing application for reservations of a limited liability company name and issuing certificate thereof, Twenty-Five Dollars ($25.00).

(8) Filing notice of transfer of reserved limited liability company name and issuing a certificate therefor, Ten Dollars ($10.00).

(9) Filing statement of change of registered office or registered agent, or both, Ten Dollars ($10.00).

(10) Filing statement of change of address of registered agent, Ten Dollars ($10.00); provided, however, that the maximum fee for simultaneous filings by a registered agent for more than one limited liability company shall not exceed Five Hundred Dollars ($500.00).

(11) Filing articles of dissolution and issuing certificate therefor, Twenty-Five Dollars ($25.00).

(12) Filing application for withdrawal and issuing certificate therefor, Ten Dollars ($10.00).

(13) Filing certificate from home state that foreign limited liability company is no longer existent in said state, Ten Dollars ($10.00).

(14) Maintaining the record of service of any process, notice or demand upon the Secretary of State as agent for foreign and domestic limited liability companies, Twenty-Five Dollars ($25.00).

(15) Filing any instrument pursuant to this act not expressly provided for above, Ten Dollars ($10.00).

B. Except as otherwise expressly provided in this act, any instrument to be filed pursuant to this act shall be signed on behalf of the limited liability company by an authorized manager or member, and the original and a copy of the instrument shall be delivered to the Secretary of State with copies attached thereto of any document incorporated by reference in or otherwise made a part of such instrument, or to be filed by means of such instrument. If the Secretary of State finds that such instrument conforms to law, the Secretary of State shall, when all taxes and fees, if any, have been paid as prescribed by law:

(1) endorse on the original and the copy of the word "filed", and the month, day, and year of the filing thereof;

(2) file the original in his office;

(3) issue any certificate required by this act relating to the subject matter of the filed instrument;

(4) return the copy, affixed to any certificate required to be issued by the Secretary of State, to the limited liability company or its representatives.

Penalty for signing false documents

Art. 9.02. A. A person commits an offense if such person signs a document such person knows to be false in any material respect with intent that the document be delivered on behalf of a limited liability company to the Secretary of State for filing.

B. An offense under this article is a Class A misdemeanor.

1992 Pocket Part Credit(s)

Added by Acts 1991, 72nd Leg., ch. 901, § 46, eff. Aug. 26, 1991.

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 4

V.T.C.A., Civil Practice & Remedies Code § 33.013
VERNON'S TEXAS STATUTES AND CODES ANNOTATED
CIVIL PRACTICE AND REMEDIES CODE
**TITLE 2. TRIAL, JUDGMENT, AND APPEAL**
SUBTITLE C. JUDGMENTS
**CHAPTER 33. COMPARATIVE RESPONSIBILITY**
SUBCHAPTER B. CONTRIBUTION

§ 33.013. Amount of Liability

(a) Except as provided in Subsections (b) and (c), a liable defendant is liable to a claimant only for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility with respect to the personal injury, property damage, death, or other harm for which the damages are allowed.

(b) Notwithstanding Subsection (a), each liable defendant is, in addition to his liability under Subsection (a), jointly and severally liable for the damages recoverable by the claimant under Section 33.012 with respect to a cause of action if:

 (1) the percentage of responsibility attributed to the defendant is greater than 20 percent; and

 (2) only for a negligence action pursuant to Section 33.001(a) or (c), the percentage of responsibility attributed to the defendant is greater than the percentage of responsibility attributed to the claimant.

(c) Notwithstanding Subsection (a), each liable defendant is, in addition to his liability under Subsection (a), jointly and severally liable for the damages recoverable by the claimant under Section 33.012 with respect to a cause of action if:

 (1) no percentage of responsibility is attributed to the claimant and the percentage of responsibility attributed to the defendant is greater than 10 percent; or

 (2) the claimant's personal injury, property damage, or death is caused by the depositing, discharge, or release into the environment of any hazardous or harmful substance as described in Subdivision (3); or

 (3) the claimant's personal injury, property damage, or death resulted from a "toxic tort." "Toxic tort" means a cause of action in tort or for breach of implied warranty under Chapter 2, Business & Commerce Code, arising out of exposure to hazardous chemicals, hazardous wastes, hazardous hydrocarbons, similarly harmful organic or mineral substances, hazardous radiation sources, and other similarly harmful substances (which usually, but need not necessarily, arise in the work place), but not including any "drug" as defined in Section 81.001(3), Civil Practice and Remedies Code.

(d) This section does not create a cause of action.

1986 Main Volume Credit(s)

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

1993 Pocket Part Credit(s)

Amended by Acts 1987, 70th Leg., 1st C.S., ch. 2, § 2.09, eff. Sept. 2, 1987.

HISTORICAL NOTES

HISTORICAL AND STATUTORY NOTES

1993 Pocket Part Historical and Statutory Notes

**1987 Legislation**

The 1987 amendment rewrote this section.

1986 Main Volume Historical and Statutory Notes

Prior Law:
  Acts 1973, 63rd Leg., p. 41, ch. 28, § 2(c).
  Vernon's Ann.Civ.St. art. 2212a, § 2(c).

# TAB 5

V.T.C.A., Civil Practice & Remedies Code § 33.013
VERNON'S TEXAS STATUTES AND CODES ANNOTATED
CIVIL PRACTICE AND REMEDIES CODE
**TITLE 2. TRIAL, JUDGMENT, AND APPEAL**
SUBTITLE C. JUDGMENTS
**CHAPTER 33. COMPARATIVE RESPONSIBILITY**
SUBCHAPTER B. CONTRIBUTION

§ 33.013. Amount of Liability

(a) Except as provided in Subsections (b) and (c), a liable defendant is liable to a claimant only for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility with respect to the personal injury, property damage, death, or other harm for which the damages are allowed.

(b) Notwithstanding Subsection (a), each liable defendant is, in addition to his liability under Subsection (a), jointly and severally liable for the damages recoverable by the claimant under Section 33.012 with respect to a cause of action if:

 (1) the percentage of responsibility attributed to the defendant is greater than 20 percent; and

 (2) only for a negligence action pursuant to Section 33.001(a) or (c), the percentage of responsibility attributed to the defendant is greater than the percentage of responsibility attributed to the claimant.

(c) Notwithstanding Subsection (a), each liable defendant is, in addition to his liability under Subsection (a), jointly and severally liable for the damages recoverable by the claimant under Section 33.012 with respect to a cause of action if:

 (1) no percentage of responsibility is attributed to the claimant and the percentage of responsibility attributed to the defendant is greater than 10 percent; or

 (2) the claimant's personal injury, property damage, or death is caused by the depositing, discharge, or release into the environment of any hazardous or harmful substance as described in Subdivision (3); or

 (3) the claimant's personal injury, property damage, or death resulted from a "toxic tort." "Toxic tort" means a cause of action in tort or for breach of implied warranty under Chapter 2, Business & Commerce Code, arising out of exposure to hazardous chemicals, hazardous wastes, hazardous hydrocarbons, similarly harmful organic or mineral substances, hazardous radiation sources, and other similarly harmful substances (which usually, but need not necessarily, arise in the work place), but not including any "drug" as defined in Section 81.001(3), Civil Practice and Remedies Code.

(d) This section does not create a cause of action.

1986 Main Volume Credit(s)

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

1995 Pocket Part Credit(s)

Amended by Acts 1987, 70th Leg., 1st C.S., ch. 2, § 2.09, eff. Sept. 2, 1987.

HISTORICAL NOTES

HISTORICAL AND STATUTORY NOTES

1995 Pocket Part Historical and Statutory Notes

**1987 Legislation**

The 1987 amendment rewrote this section.

1986 Main Volume Historical and Statutory Notes

Prior Law:
   Acts 1973, 63rd Leg., p. 41, ch. 28, § 2(c).
   Vernon's Ann.Civ.St. art. 2212a, § 2(c).

# TAB 6

REPORTER'S RECORD

VOLUME 1 OF 1

CAUSE NO. D-1-GV-06-000627

| STATE OF TEXAS | ) | IN THE 353RD JUDICIAL |
| | ) | |
| VS. | ) | |
| | ) | |
| WHITE LION HOLDINGS, LLC AND | ) | |
| BERNARD MORELLO | ) | |
| | ) | DISTRICT COURT OF |
| | ) | |
| | ) | |
| | ) | |
| | ) | TRAVIS COUNTY, TEXAS |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

REPORTER'S RECORD

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

BE IT REMEMBERED, on the 19th day of February, 2015, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Rhonda Hurley, Judge presiding, held in Austin, Travis County, Texas.

Proceedings reported by machine shorthand.

APPEARANCES

FOR THE PLAINTIFF:

MR. CRAIG PRITZLAFF
Assistant Attorney General
P. O. Box 12548
Austin, Texas   78711-2548
Phone No. 512-475-4138
Fax No. 512-320-0911

FOR THE DEFENDANT:

MR. KEITH LAPEZE AND
MR. STEPHEN A. DOGGETT
(Lapeze & Jones, PLLC)
601 Sawyer
Suite 650
Houston, Texas   77007
Phone No. 713-739-1010
Fax No. 713-739-1015


ALSO PRESENT:

MR. DAVID TERRY
Staff Attorney for TCEQ

**INDEX**

**VOLUME 1**

**HEARING**

| **FEBRUARY 19, 2015** | **Page** | **Vol.** |
|---|---|---|
| Argument by the Plaintiff---------------- | 4 | 1 |
| Argument by the Defendant---------------- | 20 | 1 |
| Rebuttal Argument by the Plaintiff-------- | 33 | 1 |
| Reporter's Certificate------------------- | 37 | 1 |

<u>P R O C E E D I N G S</u>

<u>February 19, 2015</u>

THE COURT: All right, this is cause number GV-06-000627. Would you state your appearances, please, for the record.

MR. PRITZLAFF: Your Honor, Craig Pritzlaff with the State of Texas and the Attorney General's Office.

MR. TERRY: David Terry, staff attorney for the Texas Commission on Environmental Quality.

MR. LAPEZE: Keith Lapeze and Stephen Doggett for Mr. Morello and Mr. Morello is personally here as well.

THE COURT: All right and this is the state's motion for summary judgment.

MR. PRITZLAFF: Yes, Your Honor. We're here on the state's motion for summary judgment. This is an environmental enforcement case involving the sole owner, sole manager, sole employee and sole director, who through deliberate inaction and deliberate actions caused, allowed, or permitted his company to blatantly violate laws governing --

THE COURT REPORTER: Please slow down. I'm not understanding your words.

THE COURT: And would that company be White

Lion Holdings?

MR. PRITZLAFF: White Lion Holdings, LLC.

THE COURT: Okay, go ahead.

MR. PRITZLAFF: Under Mr. Morello's watch and after suit was filed in this case the entire groundwater treatment and monitoring system at the facility was removed. This is a blatant violation of TCEQ laws, and especially the Compliance Plan pertaining to this site.

For over a decade now Mr. Morello has refused to accept the law, he's refused to accept the requirements to comply, and refused to address the contaminated groundwater on his property.

In short, his goal when he acquired this property, which is a former heavy manufacturing facility, was to clean it up. And by clean it up, I don't mean clean up the environmental issues, but clean it up to make it more enticing for prospective purchasers and/or lessors.

The presence of a large groundwater mediation system on the property was not enticing and was also costly and expensive to maintain.

In the end by avoiding his obligations for so long, by not taking one single drop of groundwater out of the ground, by not sampling a single drop of

groundwater for almost 10 years, by not repairing a single groundwater monitoring well, by not repairing a single groundwater monitoring well, by failing to report anything to the State of Texas for almost a decade, he's avoided those costs of compliance for almost a decade.

As we will discuss today, in this kind of case when you have a corporate representative, the only corporate representative that participates in, directs, and with knowledge and assents to, agrees to, that corporate individual casts aside his corporate shield and could be held individually liable.

The state has already obtained final judgment against its company White Lion, LLC back in September on summary judgment. And we believe summary judgment is appropriate in this case, Your Honor.

Now, it may be apparent from the briefing, which is voluminous, that it appears that this is a very complex case. And to some extent it is. But I think I can simplify things today for you.

I offer to you the following road map. Of course you can -- I'll drive you wherever you need me to go in this case, but I thought I would first discuss the site and the regulations that apply to the site. And then discuss Mr. Morello's role in why the state believes he should be held personally liable.

I would also like to finally address his primary defense, which is third party interference, and with that we'll turn to the facility and its background.

This facility is a heavy manufacturing facility that operated for nearly four decades in Fort Bend County in the small town of Rosenberg, which is just west of Houston, Texas.

As part of the manufacturing process the facility generated a hazardous wastewater stream consisting of acid waste and heavy metal runoff, wastewater. That acid waste was run through a series of huge impoundments on the facility.

Those impoundments collected this hazardous wastewater and became hazardous themselves because it stored hazardous waste. The facility changed its operations and proceeded to close those units. There's a federal law in place called the Resource Conservation and Recovery Act, RCRA, which governs cradle-to-grave management of hazardous waste.

Texas was delegated authority to implement that program in the state of Texas and it requires, among other things, when hazardous waste units are closed they obtain a permit.

Former owner and operator obtained a permit to close those units. And contemporaneous with that

closure they discovered the groundwater beneath those units was contaminated.

The TCEQ then issued a Compliance Plan. That Compliance Plan addressed investigation of that groundwater, and then later after a treatment protocol was set in place, it also addressed treatment and monitoring that groundwater. It is this Compliance Plan that's the subject of this suit.

Can you see this? Should I move it up further?

THE COURT: Yeah. Okay, that's good. You can come on up.

MR. LAPEZE: That's fine. I just wanted to see what it was. Thanks, Judge.

MR. PRITZLAFF: So here's the facility in general. It may be difficult -- do you want me to bring it up closer to you?

THE COURT: I can see pretty well. If you are going to point it out I'm fine.

MR. PRITZLAFF: If you see these dots, what the Compliance Plan contemplated is drilling a series of 21 monitoring wells all over the facility. Those monitoring wells are intended for the owner and operator to be able to sample the groundwater regularly.

There's also five wells here in the

impoundment that allow for the recovery of groundwater. That's treated onsite. There's an onsite treatment system called the ANTS, Acid Neutralization Treatment System. There's five of those recovery wells on the site as well.

As you can see, they're located all over the facility. The plan also requires regular monitoring and maintenance of those wells. Bi-annual groundwater samples must be taken and reports filed with the state on at least a semiannual basis.

The permittee under the Compliance Plan is also required to provide financial assurance in the amount of $574,000. That's to guarantee performance of the remedy through the life of the plan, which is set for at least 30 years, but it could go on longer if contamination remains at the facility.

Former owners and operators of the site went bankrupt in 2000, declared Chapter 11 bankruptcy and then this facility was spun out. The last groundwater samples taken of the former owners and operators was in 2003.

THE COURT: What do you mean by spun off?

MR. PRITZLAFF: The asset was sold.

THE COURT: Okay.

MR. PRITZLAFF: And the last groundwater

report filed with the state was in 2004, which is the year Mr. Morello came in and purchased the facility.

It's February 2004 that Mr. Morello entered into a purchase and sale agreement. He initially agreed to purchase the facility for $650,000. Later negotiated an amendment to that plan, which dropped the purchase price down to $150,000 for, among other reasons, assuming all the other liabilities at the facility.

He then formed White Lion Holdings, LLC and transferred his rights and obligations under the purchase and sale agreement to White Lion, and then the property was deeded to White Lion.

Let's discuss Mr. Morello's role at the facility at White Lion. Quite simple, he is White Lion. He's the only employee. He's the only decision maker, the only person responsible for making environmental compliance decisions, and most importantly, the only person that could direct and ensure White Lion would comply and manage the groundwater.

In the beginning things were good. Mr. Morello applied for and transferred the Compliance Plan over to his company. That was approved on July 23rd, 2004. That's one of the dates that's important here.

For counsel's benefit, I'm writing the date.

Later that month he wrote a letter to TCEQ requesting more time to address maintenance issues with some of the recovery wells that were already present at the facility.

He requested more time to conduct the latest round of groundwater samples, and more time to study whether another remedy may be applicable at the facility.

Would you like to see a copy of that letter?

THE COURT: It's up to you.

MR. PRITZLAFF: This is in Exhibit L of the state's motion. His words, "Due to the property transfer and the permit transfer, the first half of 2004 semiannual sampling event was not performed. These extenuating circumstances precluded submission of the semiannual Compliance Plan report. However, the next scheduled report due January 20th, 2005 will be submitted. The laboratory of QA/QC issues you raised in your April 27th, 2004 letter will be addressed in the January 2005 report submittal. I'm presently exploring other authorized handling methods for the recovered groundwater as an alternative to the handling methods specified in the existing Compliance Plan. I'm respectfully requesting TCEQ initially provide an

additional 120 days to comply."

TCEQ granted an extension. Mr. Morello thereafter ignored his own words. In late August in one of his last acts to engage with the TCEQ, Mr. Morello also asked for a delay to provide financial assurance until January 12th, 2005 because the former owner and operator already had a financial assurance policy in place.

However the TCEQ's rules required that the new owner must independently provide financial assurance within six months of acquiring ownership. And this is the TCEQ response which I believe is Exhibit N.

30 Texas Administrative Code, Section 305.64(g) is very clear that a new owner must independently provide its own financial assurance within six months, no later than six months after acquiring the facility.

Mr. Morello was explained this, and he failed to respond. So that's the other key date. That was the date by which I believe White Lion obtained the facility by a meeting on April 6th. Six months after that was October 6th. That was the date by which financial assurance had to be provided.

The reasons were multi why the rule was expressed. The reasons for the rule are sound. One, the

prior owner and operator is no longer at the facility. Two, in this case, the prior owner and operator his bankrupt.

There are also no assurances that Mr. Morello's plans to revise the Compliance Plan would comport with the rules, and he was explained that in that correspondence, and told in the interim he still needed to comply with the Compliance Plan.

Mr. Morello didn't like those responses and he ignored them. In fact, ignore, ignore, ignore is this case, and that's what the company did thereafter.

In his deposition Mr. Morello admitted -- that was September 19th, 2014 -- that the facility was in complete noncompliance with the Compliance Plan, and had not provided financial assurance, September 19th.

We have two counts in this case. One, complete total violation of the Compliance Plan as a whole. And two, failure to provide financial assurance. 3,710 days for the first count times the minimum penalty established in Section 7.102 of the Water Code, there's a penalty for that count of $185,500.00.

The second count regarding financial assurance, that's 3,653 days, times a minimum penalty set in Section 7.102 of the Water Code, $50 per day. It's $181,750.00.

The state's also seeking its attorney's fees in the amount of $26,844.00.

Let's now look and examine further why Mr. Morello, himself, should be held personally responsible in this case.

To be clear the state's not seeking to pierce the corporate veil. It's seeking civil penalties for Mr. Morello's actions to cause, allow, and permit the violations as set forth in 7.102 of the Water Code.

Here's the full text of the statute, Your Honor. I've also included Section 7.101, which is policy description that we cited in our brief, primarily because defense counsel in their response objected to our citation to that. But the operative cause of action is 7.102 for the civil penalty.

In the case of personal participation of a corporate representative, courts will disregard the usual corporate shield when an individual directs, participates in, or has knowledge of and assents to the wrongful acts. In this case the wrongful act is a violation of the statute.

As the court held in Malone Services, a case involving corporate representatives were held liable for directing or participating in violations of a permit prohibiting disposal of waste into an on-site

impoundment.

The Court held the proper mechanism for courts to look at are the actions of the individuals, not as defendants have purported, to see whether they're acting within the scope of their employment. That's already presumed.

But the actions are viewed in the context of whether to determine such actions constitute separate violations by that individual.

The statutes are structured with, among other things, this in mind. A person includes an individual. That's true in DTPA cases and was true in Malone Services, the statute issued there.

And here the issue or the evidence is overwhelming Mr. Morello caused, allowed, or permitted violation of the Compliance Plan and the financial assurance requirements.

As the sole decision maker, employee and person responsible, Mr. Morello was the only person that could cause his company to comply.

Mr. Morello instead made affirmative decisions to ensure White Lion ignored the law. He took affirmative personal actions to remove certain components of the treatment plan and monitoring system required.

These egregious actions took place after

the state filed suit in this matter, after the TCEQ initiated an enforcement.

Let's look at his affirmative actions. I'm going to focus on two here. His testimony, he said -- Mr. Morello explained that he was out at that site 60 to 80 hours a week, everyday. Incredibly, in 2006, so this -- backing up a second.

So after the correspondence with TCEQ that we discussed earlier, and Mr. Morello failed to comply, TCEQ inspected the facility in late 2004; more engagement with Mr. Morello to get him to comply, more letters. He continued to ignore it. TCEQ got to the end of the line and could not take any further action and referred the matter to the Attorney General for enforcement.

In 2006 this case was initially filed, and Mr. Morello was added in 2007 as a defendant.

In late 2006, and early 2007, and this is from a deposition in another case, Mr. Morello, with respect to the ANTS system, which is the system that would treat the contaminated groundwater, he removed it. He didn't notify the state.

He said I was going to remove it anyway. It was not broken. This had nothing to do with any third party damages at the facility. This eliminated any possibility of treating the groundwater at the facility.

Then sometime between 2008 and 2013, every single groundwater well at that site was removed. They're not hard to see. Every single one of those wells is protected by a large yellow metal housing. You can see, it's fairly thick steel. These pictures are from 2008. If you recall the picture, they were dotted all over the site.

Mr. Morello's testimony when we asked him what happened to those wells, he said that mowers at the site destroyed them, that he would pick up these pieces and throw them away.

When our inspector was out there last time in mid 2013, that's all that's left. Green fields and open holes into the ground, which that's a whole host of issues for additional contaminate migration.

These actions, these direct actions taken by Morello allowed -- he allowed them to be taken under his watch, or he took them personally himself, caused, allowed, and permitted White Lion to violate the Compliance Plan.

Mr. Morello also did a lot of inaction, made a lot of decisions to not do anything, to not repair, notify TCEQ, notify removal of equipment, file reports. These decisions to not act constitute affirmative action.

I think about it as perhaps we should ask the question of what Morello did to comply, and it would be nothing. That inaction warrants penalties in this case.

One last point, you are going to hear most likely Mr. Morello talk about third party involvement at the facility. When he purchased the facility from the bankruptcy, apparently other parties came in and removed equipment, and he said those third parties eliminated any possibility of his complying.

However, he testified that those third parties never prevented him from taking samples from the groundwater. Those wells are in place, they require no power.

Furthermore, with respect to the recovery wells, these aren't high yield wells that are coming out of the ground. A few gallons per minute, if that. The power required to power a small pump at those recovery wells would be minimal.

Irregardless, even if this defense were applicable, it doesn't apply. The question here is Mr. Morello's personal actions. It's not the third party's obligations to comply; it's Mr. Morello.

Mr. Morello never notified the TCEQ of these issues. By his own testimony, he said that work

was completed in August 2004.

Tellingly, in one of Mr. Morello's voluminous response exhibits, there are letters to insurers. Here's an example of one of them, and they're all dated around the same time; July 2005 in this case, July 16th, 2004. That's actually the one I really wanted, which is letters to the insurers to some of these third parties with respect to potential damages at the facility.

He then sent a letter, remember, in July 2009 -- or July 29th, 2004, later that month, asking for more time to comply and giving assurances to TCEQ. But he never ever notified TCEQ or alerted them that there were some problems at the facility caused by other parties.

If that defense even were applicable it would have been waived.

The evidence here is so overwhelming that Mr. Morello personally participated in, directed and had knowledge of and assented to causing, suffering, and allowing violation of the Compliance Plan.

Summary judgment is proper here, and civil penalties should be assessed. This matter has been pending for a very long time, and the facts and evidence here are so very clear. Summary judgment is the proper

means to resolve this now.

I would like to reserve the balance of my time for rebuttal.

THE COURT: All right, thank you. Not much.

Mr. Lapeze?

MR. LAPEZE: Thank you for pronouncing my name right. Do the best you can. We're taking this record for other reasons so I have that.

Your Honor, just an introduction, TCEQ is seeking nearly $400,000 in civil penalties against my client, Mr. Morello, individually when he never personally owned, never personally operated, and never held a permit personally regarding this property at issue.

The owner, operator, and permit holder in this case, and of this property is and has always been White Lion. I'll call it White Lion, like the '80s band. That is undisputed.

They make -- the state makes lots of arguments in their motion for summary judgment that Mr. Morello owned the property. That's false. He never owned it, ever.

Yes, he went to -- I'll explain the facts in a minute. He went to a bankruptcy auction and got a

purchase agreement. That's like a contract to sell. He never owned it, and I'll explain that in a minute, Judge.

The state leaves a lot of the facts out, and I think these are the most facts I've ever heard discussed at a summary judgment hearing, which is good for us, because you know the burden of proof, Judge, but let me talk about the facts for just a second. I've kind of jotted them down.

This is what the state left out for the most part. The property was owned and contaminated by Vision Metals. Vision Metals entered into Compliance Plan and permits for the TNRCC, now the TCEQ as you know, in 1988.

Vision filed for bankruptcy in 2000. Mr. Morello attended the bankruptcy auction, which he read about in the newspaper in 2004. Decided to bid on this property. And lo and behold he won the bid.

So he entered into a contract to sell, a purchase agreement for this property that he could assign it to anyone. But there are certain limitations and criteria before he closed; approval by the bankruptcy court, approval by the TCEQ. I think it was actually approval by the bankruptcy court.

Before closing, Mr. Morello assigned everything he had to White Lion. So White Lion is the

one who bought the property. White Lion's the one that negotiated with the TCEQ to enter into the permit, into the Compliance Plan.

Now, the bankruptcy trustee not only sold the real property to White Lion, it sold all of the equipment on the property to other third parties.

Remember, they're trying to get all this money for the corpus of the bankruptcy. So they sold the pipe making equipment, the metal rolls, and all these other things to 38 individual buyers.

These buyers were like vultures on a dead carcass. They went into this facility after the facility was -- after they bought it, and they tore it to pieces; removed the transformers.

There's no electricity on this property. There has not been since 2004. They destroyed the utilities. They destroyed many things. Despite the state's factual statements to the contrary, they damaged dramatically the remediation system that was out there.

These are fact issues. They caused approximately 1.4 million dollars in damages. White Lion's sole asset was this property.

When Mr. Morello purchased -- when he got White Lion to purchase this property, there was no debt. Immediately after all these vultures came in, third

parties came in and destroyed the property, it's immediately 1.4 million dollars in debt.

This happened after the Compliance Plan was entered into by White Lion. So this is what White Lion is facing, immediate debt.

Now, what did White Lion do? Well, as any lawyer would instruct White Lion to do, they started suing people, started suing these third parties, saying, look, you damaged the property. And the state pointed this out with these exhibits.

So White Lion could get the money to start complying with the remediation plan. 10 years of litigation plus, this case is still in litigation, White Lion's recovered approximately a third of the 1.4 million dollars.

A lot of that money has gone to paying lawyer's fees and whatnot on this. That's the background of all this. So you have Mr. Morello as the sole officer, sole employee of White Lion having to triage decisions. You have a patient dying on the table trying to figure out how to best handle all this.

None of this was expected when he bought it. That's the source of our affirmative defenses in this case, which we're going to talk about in a minute.

Now I want to go to the case's primary

argument at hand. And I could not have developed a better exhibit than the exhibits they did. This is what Mr. Pritzlaff said when he put this before you. Morello is White Lion. That's his quote.

I agree with that. His actions were White Lion's. The statute that they're talking about, 7.102 and 7.101, basically the same thing, talks about the actions of a person.

Of course, a person can be defined as a corporation. So the question is what is a person.

Well, when we look at a person we go back decades of Texas case law starting in 1907 where it says, the acts of a person as an agent or employee of a company are the acts of the company.

When we look into LLC law and everything else that's been cited for you in the briefing, employees, officers, whatnot cannot be held individually responsible for the obligations unless you start piercing the corporate veil.

What are the exceptions to this? Exceptions to this are -- and there's lots of case law that we've cited to you and the state in particular has cited to you -- the employee has individually committed a tort, fraud, slander, libel.

Another situation, and those are all the

cases cited, and we'll talk about Malone Services in a second because that case is really good for our side of this summary judgment. In the Holloway case, you are talking about the terms of a contract. This is more of a contract than a tort, because we're talking about things that he didn't do or was obligated to do under the Compliance Plan.

The Holloway case is great. Where it said that you can't hold an individual employee liable for the breach of a contract. The law doesn't allow that unless you prove that employee acted in bad faith or against the best interest of the company.

Again these are fact issues. Was it in bad faith? Did he commit a tort? They didn't make any allegation in their petition, we can read it, that he was fraudulent, wrongful, tortious, nothing in the petition. There's no allegations.

What their case is is that Mr. Morello, just because White Lion did it, he did it.

Now, in the background of all this, White Lion has already been held responsible in a summary judgment. Granted it's on appeal, and I know you don't want to talk about the specifics, it's a little bit outside the record, and I'm talking about some of the things they said that were outside of the record, but

there are reasons they are going after this man individually.

Now, looking at this law, this decades old law, to win summary judgment, the state must prove as a matter of law that Mr. Morello directed or participated in tortious acts, or that his actions were not in good faith or against the best interest of White Lion. That is their burden. That's the case law. That's how they separate Mr. Morello from White Lion.

Now, let's talk about the Malone Services case just briefly. Malone Services, you had employees -- first of all, it doesn't deal with 7.102 or 7.101. It's a completely different statute.

There are no cases interpreting 7.101 or 7.102 in a person. Yet employees that fraudulently sent reports to the State of Texas were dumping illegally, cutting tarps -- you know, these reports were fraudulent. And the statute said, thou shall not dump.

So it's clearly distinguishable. They were committing fraud. It's a tort.

And the Court said quote, this is tortious activity, so it falls within the elements of tort.

What's more important is that that case was after a jury trial. The jury found those people to be responsible, to be liable for their tortious acts. It

wasn't a summary judgment.

Now, the state's theory is really wrong. Let me just twist this hypothetical just a bit. If we listen to the state, how they want to interpret this, any person that causes, suffers, allows, permits, let's say I'm a shareholder, and I read my 10-Qs and 10-Ks in this small independent oil and gas company that I've invested in. They have obligations with the TCEQ that they report on and know about it.

This company then puts in a 10-Q; Hey, money is short because of the way oil is, and we can't afford to pay for these things, so we're going to let these obligations go. Just letting you know that, shareholder, that we expect in a couple quarters we'll have the money to start our obligations up again, which is a technical violation of the law if you don't do your reports or whatnot.

I'm a shareholder. I didn't come in with my own money to help the company out. Well, technically then, I caused, suffered, allowed, or permitted.

That's the question they asked him in his deposition. His deposition is attached as an exhibit. Why didn't you personally go in with your own money, Mr. Morello, and pay for these things? You should have done that. That's their argument.

This would change decades of Texas law if this argument, this strict liability argument was to be adopted. That's not the law in Texas.

In fact, the law in Texas is that for penal statutes -- and this is Footnote 58 I described this in detail in the response brief, for penal statutes, which this is, it's strict construction.

If the Legislature wants to change the law with penal statutes, then it has to make it very clear and explicit in the terms. This is not very clear that a person -- decades of law on agency law in Texas is overrun by this. And the consequences would be dire.

What the state has done in this case is effectively ignored these arguments and these issues. There is no allegation of tortious activity, fraudulent, wrongful, like I said earlier. And again, this is similar to a contract.

There are genuine issues of material fact all through these issues. Was he acting as an agent or not? All we want is our day in court on that issue, Your Honor.

Now, let's talk about the affirmative defenses. We've pled in this case affirmative defenses, third party interference, force majeure, several of these other defenses, and their inability to comply, things

like that.

As you know, Judge, and you know the law, they not only have to prove their case as a matter of law they have to disapprove the affirmative defenses as a matter of law to win.

Now, their argument in this case is, well, for force majeure in this third party interference causing you not to be able to comply because there is no money, et cetera, et cetera, you had a separate obligation under the Compliance Plan to let us know about this, and you failed to do that. So that in and of itself is a violation of the Compliance Plan.

Well, they make two causes of action in this case. Your Honor, may I approach?

THE COURT: Uh-huh.

MR. LAPEZE: And I just want to show it to you briefly. I've highlighted the relevant portions for you.

The first claim is failure to operate the complete corrective action plan. We've been calling it the Compliance Plan. And the second claim is failure to provide for financial assurance.

The specific violation rule that they claim with the corrective action plan is 30 TAC, 335.166(6). The financial assurance is a completely different

statute, and it's an independent obligation of a Compliance Plan to provide for financial assurance, 30 TAC 305.64(g).

The reason why I bring that up to Your Honor, and the reason why it's important is this. Is that financial assurance, not providing that, they have not even addressed our affirmative defenses with any argument that they have made.

Therefore, on the financial assurance piece of their argument, they lose as a matter of law. Their only argument about our affirmative defenses is regarding the Compliance Plan.

So for their Count 1 they say, okay, their affirmative defenses don't count, and this is why. They never address our affirmative defenses for Count 2 because it's separate and apart from the Compliance Plan.

Now, regarding that, they never make one allegation until their summary judgment that there's this force majeure provision in the Compliance Plan. Not one.

So because they didn't plead it, they never argued it before, they've waived it. They can't do it. We've timely objected to that in our summary judgment response.

Now, I just want to talk about some misstatements of fact, and I talked about those briefly.

All throughout the summary judgment they talk about 7.101. That's not even mentioned in their pleadings. 7.102 is. So it's very confusing about whether or not -- what they're arguing here. But 7.101 is not a policy. It is a specific statute, "thou shall not" statute.

Again, Morello never personally owned the property. He was never personally the operator. White Lion was. The notices of violation, the notices of enforcement were never issued to Morello personally. He was never put on notice that we're going to hold you personally responsible for this.

The cases cited by the state, Your Honor, I'd invite you to read them, they're all after bench trials or jury trials.

The one summary judgment is where the defendant got a summary judgment. No way there's a fact issue on whether or not he was an agent. So we're sending that back down.

And if you just read through the reply, this case is replete with fact issues. This is a serious summary judgment, Your Honor. We're talking about holding my client responsible in a summary proceeding for almost $400,000 after the state has received a summary judgment against White Lion.

And these are just for fines. The state

states in their motion for summary judgment that the only way -- and I don't understand this exactly, but I think it's worth bringing up. The only way for Mr. Morello to defeat it, if he shows that he is somehow starting to comply with this, or he's complying with this or trying to comply with the Compliance Plan.

Well, we did that. We added some exhibits to show you, Your Honor, that environmental consultants have been hired and have been working for quite awhile now on this site.

The state doesn't mention that. As a matter of fact, they try to strike those exhibits. Long story short, Your Honor, all my client wants is his day in court, be able to argue his points and defend himself in front of a jury.

And last, and I received a note from my co-counsel, last, but certainly not least, there are arguments the state made regarding how the wells work and power to operate the wells. There's nothing in the proof about that. The state doesn't have any of that in their proof in their summary judgment.

Your Honor, unless you have any questions, that is all I have, and I thank you for your time and your attention. I appreciate it.

THE COURT: Thank you, sir. All right,

briefly, very brief.

MR. PRITZLAFF: Yes. With respect to ownership, we present that not to prove up ownership. It's merely contextual to show his involvement early on.

With respect that the contamination was caused by another party, that's irrelevant. The issue here and the cause of action here is for the Compliance Plan which is in White Lion's name, and the rampant violation of that plan. Company debt is irrelevant to compliance.

The actions here of Mr. Morello constitute affirmative action to destroy that treatment unit, all the monitoring wells, taking affirmative inaction to not do anything.

Most importantly, I need to correct a very important point here. The Compliance Plan, that is not a contract. It's a creature of statutory and regulatory law. This is addressed in our response brief, our reply brief.

It is a statutorily required obligation. The state doesn't -- is not entering into an arms-length negotiation with the defendant or with the permittee to enter into that Compliance Plan. It's statutorily required.

There's no damages action. Civil penalties

is the remedy for violation. The state does not need to prove tort causes of action elements, bad faith, fraud. The elements are set forth in Section 7.102 of the Water Code. And it's not strict joint and several liability. I don't know if he said that.

It is his individual actions, whether they amount to violations of the law, and the evidence is clear that they do. He participated in, directed, and with knowledge assented to those violations.

With respect to the affirmative defenses, we've addressed those in the response brief.

And with respect to force majeure, which was just added in their most recent answer filed a week ago, it's irrelevant. It's inapplicable. Look at Section 11 of the Compliance Plan, or Section 12 of -- Section 13 of the Compliance Plan.

It specifically speaks to force majeure, and it's just not relevant here. It's a red herring. Even if it was applicable, he never filed any kind of paperwork to that effect to raise that as an issue.

With respect to the consultant hired, they were hired after the fact. And as admitted in his deposition, the facility is in complete noncompliance as of September 19th, 2014, and honestly to this day, we could seek additional 151 additional days of penalty if

Your Honor so chose to add those on.

That brings us up to the last point. I don't know if you wanted to address objections to those affidavits now.

THE COURT: I'll carry those with it under advisement.

MR. PRITZLAFF: Okay. We have two proposed orders. One for the objections and one for the --

THE COURT: Okay.

MR. LAPEZE: Your Honor, we have an order as well. May I approach?

THE COURT: Yes.

MR. PRITZLAFF: Unless you have any further questions, Your Honor.

THE COURT: I don't. Are there any deadlines coming up?

MR. PRITZLAFF: Oh, Malone Services. May I make one more point?

THE COURT: Yes, sir.

MR. PRITZLAFF: On Malone Services, he is correct, Malone Services is the key case. The statutory provision there is very similar to here. Any person who violates a provision of a permit, and I've highlighted that for you. The same definition of person as applies here.

THE COURT: Okay.

MR. PRITZLAFF: And in the Court's own words, when a corporate officer who participates in or directs the commission of a tort may be held personally liable.

And it's equating the statutory violation to the tort case law because this was a unique case at the time. Liability is based on the agent's own actions, not his status as an agent. It cites federal court case law regarding personal participation which has been adopted.

THE COURT: Thank you, sir. Okay, you-all are excused. I'll send a letter ruling.

(Hearing concluded.)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS    )

COUNTY OF TRAVIS      )

        I, Patricia A. Day, Official Court Reporter for the 98th Judicial District Court of Travis County, Texas, do hereby certify the foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

        I further certify that the Reporter's Record truly and correctly reflects the exhibits, if any, admitted by the respective parties.

        WITNESS MY OFFICIAL HAND this the 10th day of March, 2015.

                _/s/ Patricia A. Day
                Patricia A. Day, CSR, RPR, RMR
                Official Court Reporter
                98th Judicial District Court
                P.O. Box 1748, Austin, Texas  78767
                (512) 854-9629
                Certification No. 967
                Date of Expiration of Current
                Certification:  12/31/16